## In re LE CAFÉ CREME, LTD., Debtor.

## Le Café Creme, Ltd., Debtor, Plaintiff,

### v.

## Xavier Le Roux and Danielle Le Roux and William R. Horner, Defendants.

### Bankruptcy No. 97B45956(TLB). Adversary No. 97/9160A.

United States Bankruptcy Court, S.D. New York.

Jan. 3, 2000.

Paul D. Feinstein, New York City, for plaintiff.

Jeffrey D. Buss, Smith, Buss & Jacobs, L.L.P., New York City, for defendants.

## DECISION AFTER TRIAL

TINA L. BROZMAN, Chief Judge.

### Introduction

From January 1, 1991 until its business was sold on October 6, 1997 pursuant to an order of this Court, Le Café Creme, Ltd. (the "Debtor") operated a café/restaurant, the last month of that time period under this Court's aegis as a chapter 11 debtor. (Trial Transcript at page 6, hereinafter referred to as "Tr. at ___"). Xavier and Danielle LeRoux and Denis and Celestine Peron were the Debtor's shareholders, officers and directors from its inception in 1989. (Tr. at 6, 14). Over the years, the LeRouxs and the Perons each loaned over $200,000 to the Debtor. It had no other capitalization. The LeRouxs and the Perons operated as partners until early February, 1994, when the LeRouxs sold their stock back to the Debtor, leaving the Perons as the sole owners.

On November 19, 1997, the Debtor commenced an adversary proceeding against the LeRouxs. The Complaint contains seven claims for relief. The first claim for

relief is to avoid payments made by the Debtor to the LeRouxs as preferences pursuant section 547 of the Bankruptcy Code. The second claim for relief is to equitably subordinate the LeRouxs' claim pursuant to section 510(c) of the Bankruptcy Code. The third, fourth, fifth, and sixth claims are premised on actual and constructive fraud pursuant to NEW YORK DEBTOR AND CREDITOR LAW ("DCL") sections 270–276 and sections 542, 544(b), 548, 550(a) and 551 of the Bankruptcy Code. The seventh claim for relief seeks a judicial determination of the nature, extent, validity and value of the LeRouxs' claim under sections 502 and 506 of the Bankruptcy Code. The Debtor also seeks attorneys' fees and expenses pursuant to DCL section 276–a (McKinney's 1990). In their Joint Pretrial Order, the parties also raise as issues of law whether payments to the LeRouxs for the repurchase of the Debtor's stock violated section 513(a) of NEW YORK BUSINESS CORPORATION LAW, and whether the LeRouxs retained a security interest in fifty (50%) percent of the Debtor's stock which was held by Defendant William R. Horner, the escrow agent, pursuant to the terms of the Purchase Agreement [1].

The Debtor's claims arise from: (i) monies which the LeRouxs, as signatories on the Debtor's checks, allegedly repaid to themselves in 1991, 1992 and 1993 (Tr. at 56–57), to the asserted detriment of the Debtor's other creditors, for loans they made to the Debtor prior to February 4, 1994; and (ii) payments which the Debtor made to the LeRouxs pursuant to an agreement executed on February 4, 1994 ("Purchase Agreement"), whereby the Debtor repurchased its shares of stock from the LeRouxs and reaffirmed its loan obligation to them. In total, the Debtor seeks to recover $231,157.17 from the LeRouxs. Although the Debtor does not differentiate the amounts it seeks to recover as payments made under the Purchase Agreement and as repayments for loans made by the LeRouxs prior to February, 1994, based upon the parties' stipulation that $135,671.17 was paid to the LeRouxs under the Purchase Agreement, we may conclude that the Debtor is seeking to recover $95,486.00 in payments with respect to the LeRouxs' pre-February 1994 loans to the company.

These findings of fact and conclusions of law will address each of the Debtor's claims *seriatum* and are drawn from the undisputed facts contained in the Joint Pretrial Order, the trial transcript, and the exhibits introduced at trial. Some of the evidence presented at trial did not correspond to the allegations in the complaint. At the trial's conclusion, I granted plaintiff's counsel's oral application that the pleadings conform to the evidence introduced at trial.

### Findings of Fact

1. On September 9, 1997, the Debtor, a New York corporation incorporated on June 5, 1989, filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code. (Tr. at 6, 14). The Debtor operated a café/restaurant from January 1, 1991 to approximately October 6, 1997, when its business was sold pursuant to an order of this Court. (Tr. at 6).

2. Xavier LeRoux and Danielle LeRoux each owned twenty five (25%) percent of the outstanding stock of the Debtor, Le Bryant Park Café, Ltd. ("Le Bryant") and French Fast Food Corp. ("French Fast" with Le Bryant are collectively referred to as the "Corporations"), from their inception until February 4, 1994, on which date the LeRouxs and the Debtor entered into the Purchase Agreement. Also parties to the Purchase Agreement were the Perons, and the Corporations which repurchased their shares of stock from the LeRouxs. (Tr. at 83–86).

---

1. Although the parties raised this issue in their Joint Pretrial Order, because they did not address it in any of their post-trial memoranda, they are deemed to have abandoned it.

3. The value of the Debtor's capital stock at the time of its incorporation was $10,000. (Tr. at 146). According to the Debtor's federal income tax returns for an "S" corporation for the years ended 1991 through 1994, the value of its capital stock was $10,000. The value of the Debtor's capital stock, as reflected on its federal income tax returns for an "S" corporation for the years ended 1995 and 1996, was $5,000. (Plaintiff's Exhs. 19–24, hereinafter referred to as "Plaintiff's Exh. ___").

4. Peron testified that from 1992 through 1996 the Debtor had difficulty meeting its obligations and paying its bills. (Tr. at 11, 14–15). Checks were returned monthly during these years and 1997 for insufficient funds. (Tr. at 14, 18–19, 272, 275–276).

5. Xavier LeRoux testified that he and his wife advanced $220,000 to the Debtor (Tr. at 261) prior to leaving the Debtor in February, 1994, of which, according to Denis Peron's testimony, approximately $150,000 was advanced in 1989 in connection with the construction and start-up costs of the business. (Tr. at 10). Denis Peron testified that he and his wife advanced $300,000 to the Debtor (Tr. at 69), of which approximately $140,000 was advanced in 1989 in connection with the construction and start-up costs of the business. (Tr. at 10). The LeRouxs and the Perons stipulated for purposes of this trial that the LeRouxs' pre-February, 1994 advances were loans to the Debtor (collectively, the "Loans"). No interest was paid on the Loans, no promissory note was executed, none of the Debtor's corporate minutes reflected that the LeRouxs had made any loans to the Debtor, and none of the Loans had a stated maturity date. (Tr. at 10, 11, 14, 55, 60). The source of the Loans was second mortgages on two houses the LeRouxs owned and cash. (Tr. at 56, 261). One of the second mortgagees was Societe Generale. (Tr. at 60).

6. From August 11, 1989 until March 30, 1993, the LeRouxs were able to sign the Debtor's checks without obtaining the signatures of either Denis or Celestine Peron. (Plaintiff's Exh. 8). After March 30, 1993, all checks required the signatures of either Denis or Celestine Peron and Xavier or Danielle LeRoux. (Plaintiff's Exh. 10).

7. The Loans were partially repaid in 1991, 1992 and 1993, reducing them to approximately $95,000 from $220,000. (Tr. at 56, 262). Copies of canceled checks of the Debtor evidence the following payments made to Xavier LeRoux in 1991, 1992 and 1993:

| Check Number | Date of Check | Check Amount |
| --- | --- | --- |
| 2336 | 1/10/91 | $2,000 |
| 2458 | 2/12/91 | $1,500 |
| 2520 | 3/1/91 | $1,000 |
| 2553 | 3/8/91 | $1,500 |
| 2671 | 4/9/91 | $ 800 |
| 2693 | 4/15/91 | $1,500 |
| 2817 | 5/16/91 | $1,000 |
| 2907 | 6/6/91 | $1,000 |
| 3042 | 7/11/91 | $1,500 |
| 3199 | 8/19/91 | $1,200 |
| 3286 | 9/16/91 | $1,500 |
| 3391 | 10/10/91 | $1,500 |
| 5005 | 11/13/91 | $1,500 |
| 5094 | 12/9/91 | $1,500 |
| 5188 | 1/13/92 | $1,500 |
| 5298 | 2/12/92 | $1,500 |
| 5396 | 3/10/92 | $1,500 |
| 5515 | 4/14/92 | $1,500 |
| 5626 | 5/12/92 | $1,500 |
| 5744 | 6/10/92 | $1,500 |
| 5875 | 7/14/92 | $1,500 |
| 5995 | 8/10/92 | $1,500 |
| 6123 | 9/10/92 | $1,500 |
| 6261 | 10/9/92 | $1,500 |
| 6423 | 11/19/92 | $1,500 |
| 6515 | 12/12/92 | $1,500 |
| 6607 | 1/12/93 | $1,500 |
| 6735 | 2/18/93 | $1,500 |
| 6844 | 3/22/93 | $1,500 |
| 6956 | 4/19/93 | $1,500 |
| 6991 | 4/29/93 | $2,760 |
| 7055 | 5/12/93 | $1,500 |

(Plaintiff's Exh. 6). Copies of canceled checks of the Debtor evidence the following payments made to Societe Generate:

| Check Number | Date of Check | Check Amount |
| --- | --- | --- |
| 2369 | 1/21/91 | $9,830 |
| 3096 | 7/24/91 | $5,000 |
| 3209 | 8/19/91 | $4,487.29 |
| 5680 | 5/27/92 | $4,500 |
| 6058 | 8/25/92 | $4,100 |
| 6305 | 10/22/92 | $2,000 |
| 6306 | 10/22/92 | $2,000 |
| 6617 | 1/14/93 | $2,000 |
| 6616 | 1/15/93 | $2,200 |
| 6750 | 2/24/93 | $1,500 |

(Plaintiff's Exh. 6). A review of the Debtor's canceled checks indicates that a payment by check number 2766, dated May 2,

1991, was made to Martin Motors in the amount of $6,122. (Plaintiff's Exh. 6). Denis Peron testified that this payment was made to either retire an automobile lease between Xavier LeRoux and Martin Motors or enable him to enter into a new one. (Tr. at 60–61). Because the Debtor is not seeking to recover this payment, we need not address whether it is an avoidable transfer.

8. Pursuant to the Purchase Agreement, the Debtor agreed to pay LeRoux $200,000 − $105,073.61 (the "Stock Purchase Amount") for the purchase of the LeRouxs' stock (collectively, the "Stock Purchases") and $94,926.36 ("Loan Repayment") as payment of the outstanding balance of the Loans. (Tr. at 83–86; Plaintiff's Exh. 11). The payments under the Purchase Agreement were to be made as follows: (i) Forty thousand dollars ($40,000) to be paid at closing; (ii) ten thousand dollars ($10,000) to be paid within two (2) weeks of closing: and (iii) the balance to be paid in installments of $2,966.73 each (collectively, the "Payments"). Under the terms of the Purchase Agreement, the Payments are to be first applied to repay the LeRouxs' Loans and then to the Debtor's purchase of their shares of stock. (Tr. at 179; Plaintiff's Exh. 11). The parties stipulated that the Debtor paid $135,671.17 to the LeRouxs under the Purchase Agreement, of which $94,926.36 was paid on account of the Loan Repayment and $40,744,81 was paid on account of the Stock Purchases. (Joint Pretrial Order, ¶ 11).

9. As part of the Purchase Agreement, the LeRouxs executed a covenant not to compete within a specified radius of the Debtor's business for 10 years, the value of which the parties dispute. The LeRouxs contend that the ascribed value is $46,500, while Denis Peron contends that at the time the Purchase Agreement was executed, both he and Xavier LeRoux had no discussions regarding the inclusion of or value to be placed on a covenant not to compete in the Purchase Agreement (Tr. at 89, 247–248). Although the Purchase Agreement does not ascribe a value to the LeRouxs' covenant (Plaintiff's Exh. 11), Xavier LeRoux is a classically trained French chef who now teaches at the Culinary Institute of America; inasmuch as Le Café Creme serves French food, given Xavier LeRoux's expertise, nearby competition from him certainly might have had an effect on the Debtor's business.

10. In connection with execution of the Purchase Agreement, the Debtor and the Corporations executed a Non–Negotiable Promissory Note dated February 4, 1994 in the amount of $150,000, a Security Agreement granting the LeRouxs a security interest and lien upon the Debtor's equipment, furnishings and fixtures, and a Financing Statement. (Tr. at 86–88, 95–96; Plaintiff's Exhs. 11, 15, and 13, respectively). The LeRouxs also received an assignment of the Debtor's lease upon default under the Purchase Agreement. (Plaintiff's Exh. 17). Under the Security Agreement, the Debtor granted to the LeRouxs a security interest in "all furnishings and fixtures owned by the Debtor as of February 4, 1994, and all proceeds and replacements thereof (but not any chattels acquired by the Debtor after February 4, 1994, which are not in the nature of replacements of chattels owned by the Debtor as of February 4, 1994), including, without limitation, food refrigeration and freezing units, stoves, ovens, display cases, coffee making machines, cash registers, tables, chairs, cooking ware and utensils, plates, cutlery, and glassware" in specific locations. The LeRouxs perfected their security interest in February, 1994. (Plaintiff's Exh. 14).

11. The LeRouxs timely filed a secured claim in the chapter 11 case in the amount of $60,836.20 for sums allegedly unpaid by the Debtor pursuant to the Purchase Agreement.

12. Denis Peron and Howard Fishman, a certified public accountant and the Debtor's expert witness, testified that the Debtor made the following Payments to the

LeRouxs pursuant to the Purchase Agreement:

| Check Number | Date of Check | Amount of Check |
|---|---|---|
| 8035 | 2/4/97 | $ 3,500 |
| 8034 | 2/4/97 | $36,500 |
| 8102 | 2/25/94 | $10,000 |
| 8133 | 3/4/94 | $ 2,966.73 |
| 8037 | 3/11/94 | $ 1,635 |
| 8374 | 5/4/94 | $ 2,966.73 |
| 8576 | 7/5/94 | $ 2,966.73 |
| 8700 | 8/4/94 | $ 2,966.73 |
| 8817 | 9/4/94 | $ 2,966.73 |
| 8934 | 10/5/94 | $ 2,966.73 |
| 9024 | 11/4/94 | $ 2,966.73 |
| 9108 | 12/4/94 | $ 2,966.73 |
| 9189 | 1/4/95 | $ 2,966.73 |
| 9267 | 2/5/95 | $ 2,966.73 |
| 9339 | 3/3/95 | $ 2,966.73 |
| 9515 | 5/5/95 | $ 2,966.73 |
| 9576 | 6/4/95 | $ 2,966.73 |
| 9658 | 7/3/95 | $ 2,966.73 |
| 9735 | 7/31/95 | $ 2,966.73 |
| 9811 | 8/28/95 | $ 2,966.73 |
| 9922 | 10/8/95 | $ 2,966.73 |
| 9975 | 10/31/95 | $ 2,966.73 |
| 10047 | 12/5/95 | $ 2,966.73 |
| 10147 | 1/7/96 | $ 2,966.73 |
| 10191 | 2/5/96 | $ 2,966.73 |
| 10272 | 3/6/96 | $ 2,966.73 |
| 10362 | 4/5/96 | $ 2,966.73 |
| 10525 | 5/11/96 | $ 2,966.73 |
| 10606 | 6/6/96 | $ 2,966.73 |
| 10725 | 7/13/96 | $ 2,966.73 |
| 10857 | 8/11/96 | $ 2,966.73 |
| 11202 | 11/11/96 | $ 966.73 |
| 322 | 1/22/97 | $ 1,000.00 |
| 404 | 2/21/97 | $ 1,000.00 |
| 405 | 3/3/97 | $ 966.73 |
| 562 | 3/24/97 | $ 1,000.00 |
| 9431 | 4/5/97 | $ 2,966.73 |
| 698 | 4/24/97 | $ 1,000.00 |
| 975 | 7/17/97 | $ 1,000.00 |

(Tr. at 98; Plaintiff's Exh. 6). The LeRouxs did not offer the testimony of any expert witness.

13. The sources of the Payments, which were made on account of the Stock Purchases and Loan Repayment, were the Debtor's revenue and loans made by the Perons to the Debtor. (Tr. at 98–99, Plaintiff's Exh. 26).

14. Denis Peron testified that the Debtor approached Citibank for a loan in 1990 or 1991, but was informed that the bank would not make loans to restaurants. (Tr. at 115). The Debtor's federal tax return for 1993 reflected a mortgage payable from Midlantic Bank in the amount of $17,390, which, according to the Debtor's 1996 federal tax return, was reduced to $11,594. (Plaintiff's Exhs. 21 and 24). Neither the Debtor's federal tax returns nor Mr. Fishman provided any enlightenment regarding the purpose of the Midlantic mortgage. (Plaintiff's Exhs. 21 and 24; Tr. at 167).

15. Denis Peron testified that in each month from 1991 through 1997, checks made payable by the Debtor to its creditors were returned by the Debtor's bank for insufficient funds, although the number of checks which "bounced" monthly decreased in 1994. (Tr. at 17–20). Peron testified that in February, 1994, the Debtor had difficulty paying its obligations, had insufficient capital or funds to operate its business on a day-to-day basis, and had personal property, the value of which at the time of its bankruptcy filing (some three and one-half years later), did not exceed $1,600. (Tr. at 95, 108). According to Denis Peron's testimony, the Debtor's fixtures and furnishings were never appraised. (Tr. at 108).

16. Despite efforts over the years to sell the Debtor's business, no offer was made until one was received from William Byun for $98,000 in August, 1997. (Tr. 102–103). The Debtor's business and assets were ultimately sold to Mr. Byun in October, 1997 by order of this Court. Pursuant to the September 8, 1997 agreement between the Debtor and Mr. Byun (the "Byun Agreement"), the $98,000 purchase price was allocated as follows: (i) equipment and fixtures—$5,000; (ii) covenant from the Debtor not to compete—$46,500; and (iii) goodwill—$46,500. (Plaintiff's Exh. 18).

17. The Purchase Agreement does not refer to "goodwill." (Plaintiff's Exh. 11). According to the Debtor's federal tax returns, "goodwill" was not included as an asset of the Debtor for the years ended 1991–1994, although it was included as an asset with a value of zero for the year ended 1995. (Plaintiff's Exh. 19–24). The 1995 tax return also reflected the Debtor's purchase of its treasury stock as a liability in the amount of $105,000. (Plaintiff's Exh. 23). However, on its federal tax return for the year ended 1996, the Debtor

reflected this liability as "goodwill." Both Denis Peron and Mr. Fishman testified that the change from a liability to goodwill was made to show a "better" financial statement of the company. (Tr. at 127, 164, 165, 190, 245).

18. According to Denis Peron's testimony, Xavier LeRoux's weekly salary prior to 1992 was $1,600 to $1,800, (Tr. at 70, 71), which Mr. Peron believed was reduced to $1,200 a week in 1992 and 1993. (Tr. at 71–72). Mr. LeRoux testified that he rendered services as a chef and "ran" the Debtor's restaurant six (6) days a week. (Tr. at 54, 260).

19. Based upon the Debtor's federal tax returns for the years ended 1991 through 1996 and the testimony of Mr. Fishman, the Debtor's expert witness: (i) the Debtor's liabilities exceeded its assets during these years; (ii) its negative retained earnings increased from year to year during this period, except for the tax year ended 1995 when it decreased by $19,263 from a negative retained earnings of $149,131 to a negative retained earnings of $129,868; and (iii) the Debtor's insolvency during the period from 1991 to 1996 deepened. The Debtor's tax return for the year ended 1991 reflects negative retained earnings of $67,792, compared to $184,515 in negative retained earnings reflected in the Debtor's tax return for the year ended 1996. (Plaintiff's Exhs. 19–24)

20. Le Bryant Park Café, Ltd.'s corporate income tax returns for the tax years ended 1992 through 1996 reflect, as its only assets, a subscriptions receivable in the amount of $100 and a receivable from the Debtor. (Plaintiff's Exhs. 33–37).

21. The French Fast Food Corporation's income tax return for an S corporation for the tax years ended 1995 and 1996 reflect, as its only assets, receivables from the Debtor, Le Bryant Park Café, Ltd., and Café St. Bartholomew. For the tax years ended 1995 and 1996, the receivable due from the Debtor comprised at least ninety percent and seventy five percent, respectively, of the company's assets. (Plaintiff's Exhs. 31, 32). According to its 1995 tax return, at the beginning of that year, the Debtor's receivable comprised approximately ninety three percent of French Fast Food Corporation's assets. (Plaintiff's Exh. 31).

### Discussion

### I. Section 547 of the Bankruptcy Code

■ The Debtor argues that, in the year preceding the filing of its bankruptcy petition, it made Payments to the LeRouxs in the amount of $27,666.30 which may be avoided pursuant to section 547(b)[2] of the Bankruptcy Code. The Debtor has the burden of proving by a preponderance of the evidence all of the elements rendering the transfer avoidable under 11 U.S.C. § 547. Here, the LeRouxs denied all of the elements, putting the Debtor to its proof. 11 U.S.C. § 547(g). *See also Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30 (2d Cir.1996).

Under the Purchase Agreement, the LeRouxs were granted a security interest in the Debtor's Property "as security for that part of the Loan Repayment and Stock Purchase Price to be paid on a deferred basis" as set forth in the agreement.

**2.** Section 547(b) provides, in pertinent part, that:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4)(B) made between 90 days and one year before the date of the filing of the petition, if

such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(Plaintiff's Exh. 11, p. 3, ¶ 5) The Purchase Agreement provides that "all payments set forth hereinafter shall first be for [the] Loan Repayment, and after the Loan is repaid in full shall be on account of the Stock Purchase Price." (Plaintiff's Exh. 11, p. 7, ¶ 8). The parties agreed that the amounts of the Loan Repayment and the Stock Purchase Price under the Purchase Agreement are $94,926.39 and $105,073.61, respectively. (Plaintiff's Exh. 11, pp. 1–3; Joint Pretrial Order, ¶ 11).[3] Although neither party submitted sufficient evidence to determine the value of LeRouxs' secured claim under section 506(a) of the Bankruptcy Code at the time the Purchase Agreement was executed, the Byun Agreement may offer some guidance regarding the value of the Debtor's property pledged as collateral to secure the LeRouxs' claim. As previously discussed, the LeRouxs' claim is secured by all equipment, furnishings and fixtures owned by the Debtor as of February 4, 1994, and all proceeds and replacements thereof. The value ascribed under the Byun Agreement to the Debtor's equipment and fixtures is $5,000. Therefore, accepting this amount as the correct value[4] of the Debtor's property, rather than the $1,600 value ascribed in the Debtor's schedules of assets filed in this proceeding, I find that the LeRouxs' claim is undersecured in the amount of $55,836.20, leaving the LeRouxs with a secured claim in the amount of $5,000. With respect to the value of Xavier LeRoux's covenant not to compete, the value ascribed to the Debtor's covenant not to compete with Byun is not a proper measure of the value of the LeRouxs' covenant not to compete because different parties are involved. One may have been able to

compete much more effectively than the other so that the value of a promise not to do so may vary from one to the other. Having determined that the Payments were made to or for the benefit of the LeRouxs on account of the Debtor's liability to them under the Purchase Agreement, I now turn to the issues of whether the other elements of a preferential transfer have been met. *See* 11 U.S.C. § 547(b)(3), (4), and (5).

The Debtor argues that the Payments made within one (1) year of the filing of its bankruptcy petition are avoidable as preferences because the LeRouxs were insiders of the Debtor at the time the Payments were made. The LeRouxs argue that their status as insiders evaporated with their removal from the daily operation of the business. I disagree. Insiders of a debtor corporation include, among others, its directors, officers and persons in control. 11 U.S.C. § 101(31). Pursuant to the Purchase Agreement, the LeRouxs' stock was deposited into escrow. The Agreement further provided at paragraph 9(d) that upon default in payment of the Loan Repayment and Stock Purchase Price or any installment thereof, or any interest thereon, should such default continue for 15 days after written notice thereof, the LeRouxs, at their sole option, in addition to any other remedies that might be available to them, could (i) rescind the sale, in which case the stock would be returned to them and they could compel dissolution of any or all of the businesses or (ii) sell the shares at public sale, retaining the right to purchase the shares themselves. Because the Agreement required payment of installments on a prescribed schedule and the LeRouxs

3. Although neither party submitted evidence of the exact amount of the payments made by the Debtor to the LeRouxs on account of the Stock Purchase Price, based upon the parties' stipulation that $135,671.17 was paid to the LeRouxs under the Purchase Agreement, it appears that $40,744.81 was paid to the LeRouxs on account of the Stock Purchases (Plaintiff's Exh. 11; Joint Pre–Trial Order).

4. "[R]egardless of the purpose of the valuation, if an actual sale (or equivalent disposition) is to occur, the value of the collateral should be based on the consideration to be received by the estate in connection with the sale, provided that the terms of the sale are fair and were arrived at on an arm's-length basis." 4 L. King, COLLIER ON BANKRUPTCY, ¶ 506.03[6][c], at 506–40 (15th ed. rev.1999).

could recover their shares if the schedule were not adhered to, they remained in effective control over whether the Payments were made. Further, the Agreement provided at paragraph 12 that the Perons could not sell or transfer any of their interests in any of the businesses without the consent of the LeRouxs, who agreed not to unreasonably withhold or delay consent. This meant that the Perons could not even bring in new partners without consent. Plainly, the LeRouxs retained incidents of control, notwithstanding that if the Perons did what was required of them, they could operate on a daily basis free from interference. *Cf. In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 131 (Bankr.D.Mass.1989);[5] *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1466 n. 13 (5th Cir.1991). *See also In re F & S Central Mfg., Corp.*, 53 B.R. 842, 848 (Bankr.E.D.N.Y.1985)[6] ("[a] creditor who does not deal at arms length with the debtor but who has a special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider."). Having found that the LeRouxs were insiders, I next turn to the issue of whether the transfers which the Debtor seeks to avoid as preferences were made between ninety (90) days and one (1) year before the date of the filing of the petition. *See* 11 U.S.C. § 547(b)(4).

 The Debtor argues that the following Payments[7] were made during this period:

| Date of Check | Date of Payment of Check | Amount |
| --- | --- | --- |
| 11202 | 11/20/96 | $ 966.73 |
| 322 | 1/23/97 | $1,000.00 |
| 404 | 2/24/97 | $1,000.00 |
| 405 | 3/4/97 | $ 966.73 |
| 562 | 3/26/97 | $1,000.00 |
| 698 | 4/25/97 | $1,000.00 |
| 975 | 8/19/97 | $1,000.00 |
| TOTAL: | | $6,933.46 |

(Plaintiff's Exhs. 25, 26). The LeRouxs counter that the determinative transfer is not when the Payments under the Purchase Agreement were made, but when the Purchase Agreement was executed. The issue is whether the Debtor may separate the installment payments from the Purchase Agreement in this manner.

 A "transfer," as defined in section 101 of the Bankruptcy Code is "every mode, direct, or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54). "Transfer of possession, custody or control fall within the definition of an interest of the debtor in property." 2 L. King, COLLIER ON BANKRUPTCY, ¶ 548.02[1][b] at 548–12 (15th ed. rev.1999). "The retention of title as a security interest is a transfer, just as the granting of a lien would be a transfer." 2 COLLIER ON BANKRUPTCY, ¶ 101(54) at 101–153. An obligation or debt "is incurred when a debtor becomes legally bound to pay." *Nolden v. Van*

5. *Vadnais* suggests that if payments are contracted for by an insider in control of the debtor and the insider then departs, the payments made pursuant to the contract are judged, for preference purposes, as having been made to an insider, that is, they are avoidable if made during the one-year period preceding bankruptcy because the fact of control has prompted the payments. 100 B.R. at 131. Although the same argument could be made here, it is unnecessary to reach it, because, under our facts, the LeRouxs retained incidents of control after their stock was placed into escrow.

6. In *F & S Central*, the court found that the defendant had the requisite control over the debtor to be an insider because, under the express terms of the stock purchase agreement, the defendant was able to reacquire full legal control of the debtor if the debtor failed to make the requisite transfer of funds to the defendant pursuant to the agreement. *Id.* at 848.

7. *See Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) (in determining whether a payment by ordinary check fell within the 90 day preference period under section 547(b), a "transfer," as defined in section 101, occurred on the date the check is honored and not tendered.).

*Dyke Seed Co. (In re Gold Coast Seed Co.),* 751 F.2d 1118, 1119 (9th Cir.1985). *See also In re G. Survivor Corp.,* 217 B.R. 433, 440 (Bankr.S.D.N.Y.1998); *Barash v. Public Finance Corp.,* 658 F.2d 504, 511 (7th Cir.1981); 9A AM.JUR.2D BANKRUPTCY § 1770 (2d ed.1991).

> The incurring of a debt has often been determined on the nature of the goods delivered and the process of delivery. If the contracted for performance is an entire indivisible unit, courts have held that the payment obligation is deemed to arise upon completion of performance. If the contracted for performance is inherently divisible or of an on-going requirement nature, courts have held that the debt is incurred incrementally upon receipt of services. (citations omitted). From these cases, it appears that the courts, in line with business practices, look to see the nature of the contract and of the debt in determining when a debt arises. A contract is divisible if the 'performance by each party is divided into two or more parts' and such performance is the 'agreed upon exchange for a corresponding part of the other party.' (quoting RESTATEMENT (SECOND) OF CONTRACTS § 265 Comments a, d (1979)). If it is so divisible or if the debt arises in quantum meruit, a debtor is likely to be viewed as having made payment for each of the benefit [sic] conferred. But if the contracted for performance is an indivisible unit or if the debt lies in contract, then full payment of a debt is to be considered as a payment of the full contractual obligation rather than payment for a series of partial performances.

*Transpacific Carriers Corp. v. Texaco International Trade, Inc. (In re Transpacific Carriers Corp.),* 50 B.R. 649, 652 (Bankr. S.D.N.Y.1985), *aff'd,* 113 B.R. 139 (S.D.N.Y.1990). *See also Gold Coast Seed,*

751 F.2d 1118. Here, the parties executed the Purchase Agreement, Security Agreement and Promissory Note on February 4, 1994 as part of the same transaction. In addition, pursuant to the terms of the Security Agreement, which the Purchase Agreement references, the Debtor granted to the LeRouxs a security interest in its equipment, furniture and fixtures. It is at this time that the Debtor granted to the LeRouxs a security interest in its property and its contractual obligation to make the Payments arose. Because it is undisputed that the LeRouxs fully performed under the Purchase Agreement by depositing their shares of stock into escrow and complying with the terms of Xavier Peron's covenant not to compete, the LeRouxs' performance is not a divisible unit. Moreover, the Debtor's obligation to pay the LeRouxs for their full performance, albeit in the form of installments, arose upon execution of the Purchase Agreement and related documents. The Debtor's installment payments are not divisible transfers of the Debtor's interest in property, separate from the Debtor's execution of the Purchase Agreement and the granting of the LeRouxs' security interest in the Debtor's furniture and fixtures. Accordingly, because the Debtor's transfer for section 547(b)(4)(B) purposes occurred on February 4, 1994, nearly three and one-half years before the filing of the Debtor's bankruptcy petition, the Debtor's first claim for relief is time-barred.

## II. Equitable Subordination Under Section 510(c) of the Bankruptcy Code

■ The Debtor's second claim for relief is to equitably subordinate the LeRouxs' $60,836.20 claim under section 510(c) of the Bankruptcy Code [8] on the grounds that the LeRouxs, as insiders,

---

**8.** Section 510(c) of the Bankruptcy Code provides that the court may:

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of

another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

engaged in conduct that was unfair to creditors.

To determine if conditions exist warranting the equitable subordination of an insider's claim, most courts have followed and applied the criteria articulated by the court in *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977). Under the *Mobile Steel* test, a claim is equitably subordinated if there is a showing by a preponderance of the evidence that (i) the claim holder engaged in some type of inequitable conduct, (ii) which injured the creditors of the debtor or conferred an unfair advantage on the claimant, and (iii) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy [Code]. *Id.* at 700. *See also In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir.1997). "Equitable subordination is an unusual remedy which should be applied only in limited circumstances." *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir.1991). "A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Id.* at 1465 (citations omitted). Nonetheless, "the mere fact of an insider relationship is insufficient to warrant subordination." *Id.* at 1467 (citing *Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.)*, 712 F.2d 206, 210 (5th Cir.1983)). The initial burden of going forward with factual evidence to overcome the validity of the claimant's proof of claim rests on the trustee or a fiduciary. Once the initial burden is met, it then shifts to the claimant "to demonstrate its good faith and the fairness of its conduct." *Id.* at 212 (citing *Mobile Steel*, 563 F.2d at 701). Applying the "rigorous scrutiny" standard to review the LeRouxs' conduct, we will now examine whether the LeRouxs engaged in misconduct which injured the Debtor's creditors or conferred an unfair advantage on themselves.

Three categories of misconduct have generally been recognized to constitute inequitable conduct: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Fabricators*, 926 F.2d at 1467; *see also Lifschultz*, 132 F.3d at 344 (quoting *In re Missionary Baptist Foundation of America*, 712 F.2d 206, 212 (5th Cir. 1983)). Undercapitalization of the debtor alone, absent misconduct by the insider, is insufficient to justify equitable subordination of an insider's debt claim. *Id.* at 343.

The Debtor alleges that the LeRouxs' claim should be equitably subordinated because the Debtor was not only undercapitalized at the time the Loans were made and the Purchase Agreement was executed, but the LeRouxs, as insiders, engaged in misconduct by repaying their loans first to the detriment of the Debtor's other creditors. The burden is upon the Debtor to show that it was initially undercapitalized or that the Loans were made when no other disinterested lender would have extended credit. *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr.N.D.Fla.1990). As explained by the Fifth Circuit in *In re Multiponics, Inc.*, 622 F.2d 709, 717 (5th Cir.1980), capitalization is inadequate if, "in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized; [or] at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source." *See also Official Committee of Unsecured Creditors of Interstate Cigar Co. v. Bambu Sales, Inc. (In re Interstate Cigar Co.)*, 182 B.R. 675, 679 (Bankr.E.D.N.Y.1995) ("A significant test for capital contribution is whether a disinterested lender would have made such loans at the same time."). The *Multiponics* court looked to the company's initial capitalization, "asking whether a company was adequately capitalized at the time of its organization," as the relevant time frame for analysis. *Multiponics*, 622 F.2d at 717. "Proof of subsequent under-

capitalization may be further proof of inequitable conduct, such as actions of gross mismanagement, self interest, and the like." *Id.* at 718.

The value of the Debtor's capital stock at the time of its incorporation in 1989 was $10,000, (Tr. at p. 146), which, according to its 1994 tax return, was devalued to $5,000. (Plaintiff's Exh. 22). The LeRouxs did not pay for the stock of the Debtor. (Tr. at 14). Denis Peron testified that the Debtor was underfinanced from at least 1991, did not have enough money to operate from day to day (Tr. at 90), and that in 1990 or 1991 the Debtor had approached Citibank for a loan, which was refused because the bank did not make loans to restaurants. (Tr. at 115). There was no other evidence submitted with respect to the Debtor's other efforts to obtain a loan from outside sources, except that Mr. Fishman testified that the Debtor's tax returns showed a loan payable to Midlantic Bank. (Tr. at 167). Peron was testifying as a fact witness and not as an expert. Although Mr. Fishman, who is a certified public accountant and a treasurer of one public corporation (Tr. at 117–121), can be viewed as a qualified skilled financial analyst, he did not opine regarding whether the amount of the Debtor's initial capitalization was insufficient to support a business of the size and nature of the Debtor's in light of the circumstances existing at the time the Debtor was capitalized. Rather, his testimony addressed the amount of the Debtor's initial capitalization, its later inability to meet its obligations, and its insolvency based upon the Debtor's tax returns for the years ended 1991 through 1996. Accordingly, the Debtor has failed to meet its burden of proving that it was initially undercapitalized. We will now turn to whether the Debtor has sufficiently shown that the LeRouxs engaged in inequitable conduct warranting the subordination of their bifuricated claim.

Conduct engaged in by an insider is subject to rigorous scrutiny. The evidence presented abundantly showed that the LeRouxs, as insiders and having knowledge of the Debtor's financial affairs, repaid themselves on account of their Loans and entered into the Purchase Agreement to convert their equity into debt while the Debtor had insufficient funds to pay its suppliers and routinely paid suppliers with checks which were returned for insufficient funds. Although there is testimony that many of the Debtor's Payments to the LeRouxs actually came from monies loaned by the Perons to the Debtor (Tr. at 86, 99, 227), the path of these funds does not in any way absolve the LeRouxs of their inequitable conduct because the additional loans from the Perons, who are creditors of the Debtor, only resulted in increasing the amount of their claims and diluting the amount of any potential distribution to the Debtor's other creditors.[9] In effect, the LeRouxs shifted the risk of loss from themselves to the Debtor's creditors, to their obvious detriment. In addition, as part of the LeRouxs' actions to gain an advantage over the position of other creditors, the LeRouxs obtained a security interest in the Debtor's assets. The LeRouxs did not rebut the Debtor's case with any evidence demonstrating their good faith and the fairness of these transactions. Accordingly, I find that the LeRouxs' conduct is inequitable and warrants equitable subordination of their claim.

The next question is to what extent the LeRouxs' claim ought be equitably subordinated. "The general rule is that claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered as a result of the inequitable conduct." *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.,* 926 F.2d 1458, 1470 (5th Cir.1991) (citation omitted)). *See also In re 80 Nassau Associates v. Crossland Federal Savings Bank*

---

**9.** Remember that the parties have stipulated that the loans of the LeRouxs and the Perons to the Debtor were just that, loans, and not capital contributions.

*(In re 80 Nassau Associates),* 169 B.R. 832, 840 (Bankr.S.D.N.Y.1994) ("The principle of equitable subordination ... empowers and requires the Bankruptcy Court to tailor the remedy to fit the harm. If the injury or unfair advantage affects only a specific creditor or segment of creditors, the court should subordinate the offending claimant only to the more limited class of claims rather than the claims of all creditors."). I conclude that both the secured and unsecured portions of the LeRouxs' $60,836.20 claim relating to the Payments owed to the LeRouxs warrants equitable subordination below the status of general unsecured creditors. This indebtedness was not incurred on account of monies loaned by the LeRouxs to the Debtor in an attempt to revitalize its business, but to gain an unfair advantage and to siphon money from the Debtor to the injury of its creditors.[10] An examination of the schedules of creditors attached to the Debtor's bankruptcy petition plainly shows a significant increase in the Debtor's liabilities during 1996 and 1997, when the Debtor made the Payments to the LeRouxs on account of the Stock Purchases. The equitable subordination of the remaining indebtedness below the status of general unsecured creditors would offset the harm which the Debtor and its creditors suffered as a result of the inequitable conduct, a result which is fully consistent with the Bankruptcy Code, particularly its policies of preventing prejudice to creditors and ensuring fair distribution.

### III. Section 548(a)(2) of the Bankruptcy Code

■ The Debtor argues that the Payments are avoidable as fraudulent conveyances under section 548(a)(2) of the Bankruptcy Code, which authorizes a debtor to avoid transfers that are made without "reasonably equivalent value in exchange for such transfer or obligation" when the debtor (i) "was insolvent on the date such transfer was made or such obligation was incurred; (ii) was engaged in business ... for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(i), (ii) and (iii). Specifically, the Debtor argues that (i) it was insolvent within the six (6) years prior to the commencement of its bankruptcy proceeding, (ii) the LeRouxs knew or should have known of the Debtor's insolvency; (iii) the Debtor was undercapitalized at the time of the execution of the Purchase Agreement; (iv) the Debtor was insolvent because it was unable to pay its debts as they came due; and (v) the Debtor at the time it executed the Purchase Agreement was unable to pay its debts as they fell due.

The LeRouxs argue in response that: (i) the Debtor, by not valuing its assets as a going concern, failed to meet its burden of establishing a *prima facie* case of insolvency; (ii) the Debtor received reasonably equivalent value in exchange for the Payments to the LeRouxs by receiving ownership of shares of the Debtor's stock, the LeRouxs' covenant not to compete, and satisfaction of an antecedent debt; and (iii) the Debtor is time-barred from seeking recovery of the Payments because the transfer occurred on February 4, 1994 or, in the alternative, only $5,000 in Payments is subject to the Debtor's fraudulent conveyance claim. I will treat first with the LeRouxs' argument that the Debtor's section 548 fraudulent conveyance is time-barred. This argument, as with the argument raised by the LeRouxs in opposition to the Debtor's claim to avoid certain Payments as preferences, turns on whether the Debtor may divide the installment pay-

---

10. Under the Purchase Agreement, the installments were to be applied first to the Loan Payments and thereafter to the Stock Purchases. The initial sum due the LeRouxs' was $200,000, of which $135,000 was paid; the balance on the loans was approximately $95,000 and the Stock Purchase Price was approximately $105,000; thus, all sums outstanding are on account of the Stock Purchases alone.

ments in this manner. Section 548(a)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition."[11] As discussed in Point I, *supra*, the Debtor transferred its interest in its property when it executed the Purchase Agreement and not when it made each installment payment. Therefore, for the same reasons that the Payments are not subject to attack as preferential transfers and because the Purchase Agreement was executed outside the one year reach-back period, the Debtor's claims under sections 548(a)(1) and 548(a)(2) are dismissed.[12]

### IV. Section 544(b)

 Section 544(b) of the Bankruptcy Code "borrows" applicable non-bankruptcy law which would be available to an unsecured creditor of the debtor, authorizing the avoidance of "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim ...". 11 U.S.C. § 544(b). "Under section 544(b), the trustee succeeds to the rights of an [allowed] unsecured creditor in existence at the commencement of the case who can avoid the transfer or obligation under applicable state or local law. If there are no creditors against whom the transfer is voidable under the applicable law, the trustee is powerless to act under section 544(b)." 5 L. King, COLLIER ON BANKRUPTCY, ¶ 544.09, at 544–17 (15th ed. rev.1999). The burden is on the trustee to demon-

strate the existence of an actual creditor with a viable cause of action against the debtor which is not time-barred or otherwise invalid. *See In re 9281 Shore Road Owners Corp.*, 187 B.R. 837 (E.D.N.Y. 1995). The principal purpose of section 544(b) of the Bankruptcy Code "is to undo pre-petition transfers of property that remove or withhold that property from the estate to the prejudice of creditors." *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 311 (Bankr.S.D.N.Y.1999). "Section 544, however, contains no original substantive provisions to determine when a pre-petition transfer is voidable; instead it incorporates and makes applicable non-bankruptcy law, which in the present case is the [New York Debtor and Creditor Law]."[13] *Id.* (citations omitted).

The Debtor argues that it has standing to prosecute an action under section 544(b) because the Perons were unsecured creditors of the Debtor as of the commencement of the Debtor's case and at the time the Purchase Agreement was executed. According to the Debtor's schedules of creditors holding unsecured priority and nonpriority claims, (Plaintiff's Exh. 2), there existed numerous creditors with non-contingent, undisputed, liquidated claims for liabilities arising in 1996 and 1997. There can be no real contest, therefore, as to the existence of at least one actual, unsecured creditor at the time of the filing of the Debtor's petition who could set aside these Payments as fraudulent transfers under the DCL. And because the reach-back period under the DCL is six years, all of the Payments made by the Debtor to the LeRouxs under the Purchase Agreement and with respect to loans the Le-

---

**11.** In computing the one-year period, the day on which the petition was filed is excluded. 5 L. King, COLLIER ON BANKRUPTCY, § 548.02[2] at 548–16 (15th ed. rev.1999).

**12.** It is unclear from the Debtor's pleadings whether the Debtor also seeks to avoid the Payments under Section 548(a)(1)(A) of the Bankruptcy Code on the grounds of actual fraud. However, because the Payments were

made outside the one year reach-back period, it is unnecessary to determine whether the Debtor is seeking and is entitled to relief on this ground.

**13.** New York's DCL Article 10 enacts the Uniform Fraudulent Conveyance Act rather than the more modern Uniform Fraudulent Transfer Act.

Rouxs made prior to February, 1994 are subject to attack.

### i. Actual Fraud

 Claims of actual fraud fall under DCL section 276[14]. DCL § 276 (McKinney's 1990). A conveyance may be avoided on the basis of actual fraud if the *scienter* requirement of "actual intent to hinder, delay, or defraud" present and future creditors is established. 30 N.Y.Jur.2d, Creditors' Rights and Remedies, §§ 332–333 (1997). If actual fraud is established, the adequacy of the consideration and the solvency of the transferor is immaterial. *Id.* As discussed at great length in *Stratton Oakmont*, 234 B.R. 293, 315, "actual intent" is rarely susceptible to direct evidence and therefore may be gleaned from the circumstances surrounding the alleged fraudulent transaction. The Second Circuit has adopted certain "badges of fraud" or presumptions as circumstantial evidence of actual intent. *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir.1983). These may include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Kaiser*, 722 F.2d at 1582. Other relevant recognized indicia of fraud are: (i) a transfer for no consideration when the transferor and the transferee know of the claims of creditors and know that creditors cannot be paid and (ii) the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor. *Breeden v. Bennett (In re The Bennett Funding Group, Inc.)*, 220 B.R. 743, 755 (Bankr.N.D.N.Y. 1997) (citing 5 L. King, Collier on Bankruptcy, ¶ 548.04[2][b] at 548–24 (15th ed. rev.1997)). Under DCL section 276, actual intent to defraud must be proven by clear and convincing evidence. *See United States v. McCombs*, 30 F.3d 310 (2d Cir. 1994). "It is the intent of the transferor and not that of the transferee that is dispositive." *Stratton Oakmont*, 234 B.R. 293, 318 (citing *HBE Leasing Corporation v. Frank*, 61 F.3d 1054, 1059 n. 5 (2d Cir.1995)) (to prove actual fraud under section 276, a creditor must show intent to defraud on the part of the transferor); *Crowthers McCall Pattern, Inc. v. Lewis (In re Crowthers McCall Pattern, Inc.)*, 129 B.R. 992, 999 (S.D.N.Y.1991): *Brody v. Pecoraro*, 250 N.Y. 56, 61–62, 164 N.E. 741 (1928) (Cardozo, J.); *Leone v. Sabbatino*, 235 A.D.2d 460, 652 N.Y.S.2d 628, 629 (1997). "The intent of the transferee only becomes relevant as an affirmative defense if the defendant is not the initial transferee." *Stratton Oakmont*, 234 B.R. at 318 (citing *Golden Budha Corporation v. Canadian Land Company of America*, 931 F.2d 196, 201 (2d Cir.1991); *Leone*, 652 N.Y.S.2d at 629). *See also United States v. Orozco–Prada*, 636 F.Supp. 1537, 1541 (S.D.N.Y.1986) ("Proof of actual fraudulent intent makes a *prima facie* case and shifts to the grantee the burden of establishing his good faith in the transfer.").

 The Debtor did not receive fair consideration for the repurchase of its shares of stock from the LeRouxs, who were insiders of the Debtor. The LeRouxs had converted their equity, which had little or no value in light of the Debtor's insolvency, into debt, and had taken a

---

**14.** Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. DCL § 276 (McKinney's 1990).

security interest in the Debtor's equipment, furniture and fixtures to insure its repayment over the claims of the Debtor's other creditors. As will be discussed in Point IV(ii), *infra*, the Debtor was insolvent under the "balance sheet" test and was unable to meet its debts both prior to and at the time the Debtor executed the Purchase Agreement. Moreover, because both Mr. Peron's and Mr. LeRoux's knowledge of the Debtor's financial difficulties may be imputed to the Debtor, the Debtor knew that execution of the Purchase Agreement, which was not negotiated at arms-length, would only deepen its insolvency and adversely affect its ability to pay its debts as they came due. The evidence presented also demonstrated that the LeRouxs had engaged in this course of conduct for several years. Accordingly, I find, based upon the clear and convincing evidence presented, that the Debtor, through the LeRouxs, engaged in actual fraud, with intent to hinder or delay present and future creditors of the Debtor.

**15.** Section 276–a of the DCL provides, in pertinent part, that: "[i]n an action or special proceeding brought by a creditor, ..., trustee in bankruptcy, ... to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor, ..., trustee in bankruptcy, ... shall recover judgment, the justice ... presiding at the trial shall fix the reasonable attorney's fees of the creditor, ..., trustee in bankruptcy, ... in such action or special proceeding, and the creditor, ..., trustee in bankruptcy, ... shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment." (McKinney's 1990).

**16.** The Debtor bases its constructive fraud claims (Third, Fourth and Fifth Claims for Relief) on DCL sections 272 through 275:

Section 272 Fair Consideration: Fair consideration is given for property, or obligation,
a. When in exchange for such property, or obligation, as a fair equivalent transfer, and in good faith, property is conveyed or an antecedent debt is satisfied, or

With respect to the Debtor's request for attorneys' fees under DCL section 276–a,[15] I am permitted to fix the reasonable attorney's fees of plaintiff's counsel. A hearing will be held to determine the reasonableness of plaintiff's counsel's attorney's fees after an appropriate fee application is filed and served and an opportunity for a response is given. *See Goscienski v. LaRosa (In re Montclair Homes, Inc.)*, 200 B.R. 84, 98 (Bankr.E.D.N.Y.1996) (citing *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 508 N.Y.S.2d 17 (2d Dept. 1986)).

### ii. Constructive Fraud

The third and fourth claims for constructive fraud are governed by DCL sections 273 through 275.[16] To prevail, the Debtor must show that it transferred property (the Payments) for less than fair consideration under any one of the following conditions: while it was insolvent or which transfers rendered it insolvent; while it suffered from unreasonably small

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.
Section 273 Conveyance by Insolvent: Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
Section 274 Conveyances by Persons in Business: Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.
Section 275 Conveyances by a Person about to Incur Debts: Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.
(McKinney's 1990).

capital; or while it knew that it would be unable to pay debts as they became due. *See Montclair Homes,* 200 B.R. at 95 (citation omitted). As with all fraudulent transfers under the DCL, the reach-back period is six (6) years. *See* N.Y.C.P.L.R. § 213 (McKinney's 1990).

 Because the absence of "fair consideration" is an essential predicate to recovery under any of the constructive fraud theories, we begin there. As is evident from the definition found in section 272(a) of the DCL, the concept has two separate components, the fair equivalency of the consideration given for the debtor's transfer and good faith. The burden of proof is on the creditor to establish that the conveyance was made without fair consideration *Petersen v. Vallenzano,* 849 F.Supp. 228, 231 (S.D.N.Y.1994). The evidence presented showed that the Payments made with respect to the Loans and the Loan Repayments under the Purchase Agreement satisfied an antecedent debt owed by the Debtor to the LeRouxs, whereas the Debtor received less than fair consideration for the Stock Purchases. However, the "[t]he element of 'fair consideration' is not met when the good faith component of [s]ection 272(a) is missing." *Montclair Homes,* 200 B.R. at 96 (citing *Atlanta Shipping Corp., Inc. v. Chemical Bank,* 818 F.2d 240 (2d Cir.1987)). "[U]nder New York law, transfers from an insolvent corporation to an officer, director or major shareholder of that corporation are per se violative of the good faith requirement of DCL § 272 and the fact that the transfer may have been made for a fair equivalent is irrelevant." *In re Centennial Textiles, Inc.,* 220 B.R. 165, 172 (Bankr. S.D.N.Y.1998) (citations omitted). *See also Atlanta Shipping,* 818 F.2d at 249 ("repayment of an antecedent debt constitutes fair consideration unless transferee

is officer, director or major shareholder of transferor.").

 Good faith is required of both the transferor and the transferee. *Eisenberg v. Feiner (In re Ahead By A Length, Inc.),* 100 B.R. 157, 169 (Bankr.S.D.N.Y. 1989); *Julien J. Studley, Inc. v. Lefrak,* 66 A.D.2d 208, 213, 412 N.Y.S.2d 901, 905 (2d Dept.), *aff'd,* 48 N.Y.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979); *In re Checkmate Stereo and Electronics, Ltd.,* 9 B.R. 585 (Bankr.E.D.N.Y.1981), *aff'd,* 21 B.R. 402 (S.D.N.Y.1982). "Good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer, ... or because of a transferee's position as an insider with control over the corporation's finances." *Checkmate,* 9 B.R. at 617. The evidence established that the LeRouxs did not act in good faith with respect to the questioned transfers because, at the time they were made, the LeRouxs were insiders of the Debtor and the Debtor was insolvent,[17] more about which will be said momentarily. As previously found, the Debtor participated in the transfers with fraudulent intent. Thus, the good faith requirement of DCL section 272 was not satisfied. I will treat next with the issue of the Debtor's insolvency.

 Applying the "balance sheet" test, *see Centennial Textiles,* 220 B.R. 165, 172–174, I find that the Debtor met its burden of proving that it was insolvent. "[T]he burden is upon the attacking creditor to prove that the debtor was insolvent at the time the questioned transfer was made or that he was without property after such transfer." 30 N.Y.JUR.2D, Creditors' Rights and Remedies, § 340 (1997) Although Mr. Fishman testified that he did not verify the accuracy of the numbers reflected in the Debtor's federal tax returns for the tax years ended 1991 through 1996, based upon the returns, his testimo-

---

**17.** Section 271 of the DCL provides:

 A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his proba-

ble liability on his existing debts as they become absolute and matured. (McKinney's 1990).

ny and the testimony of Denis Peron, the Debtor's liabilities exceeded its assets and it had negative retained earnings during this period. Moreover, the Debtor's insolvency deepened, most particularly after execution of the Purchase Agreement. The LeRouxs argue that the Debtor's going concern value should be considered in any analysis of the Debtor's insolvency. However, even under their argument, the Debtor was insolvent during the years in question. Fair value, in the context of a going concern, is determined by "the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 35 (2d Cir.1996) (citations omitted). "[A] company's assets must be valued at the time of the alleged transfer and not at what they turned out to be worth at some time after the bankruptcy intervened." *In re Coated Sales, Inc.*, 144 B.R. 663, 667 (S.D.N.Y.1992). "The Bankruptcy Court has broad discretion when considering evidence to support a finding of insolvency." *Roblin*, 78 F.3d at 35 (citations omitted). Denis Peron's uncontroverted testimony is that despite his and Xavier LeRoux's efforts to sell the Debtor's business, no offers were received until William Byun's offer of $98,000 in August of 1997. (Tr. at 102, 103). Thus, an inference can be drawn that the Debtor's fair saleable value was less than $98,000,[18] clearly less than the more than $300,000 in liabilities reflected each year on the Debt-

or's tax returns. (Plaintiff's Exhs. 19–24). In addition, the Debtor's tax returns for the years ended 1991–1994 did not reflect a value for the Debtor's goodwill and its tax return for the year ended 1995 reflected goodwill as having a value of zero. Accordingly, I find that the LeRouxs did not act in good faith and are liable under DCL section 273.

The Debtor also seeks to set aside the Payments as fraudulent conveyances pursuant to DCL sections 274 and 275. Having found that the challenged transfers were made without fair consideration, I turn next to the issues of whether the Debtor met its burden of proving that it was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the challenged conveyance was unreasonably small capital [19] or whether the Debtor intended or believed that it would incur debts beyond its ability to pay as they mature.[20] With respect to the former claim for relief, the Debtor established that the Payments and execution of the Purchase Agreement were made without fair consideration. The evidence presented demonstrated that at the time the Debtor executed the Purchase Agreement, it was cash poor, unable to pay its debts as they came due, and that the LeRouxs knew or should have known of the Debtor's precarious financial condition at the time of the transfers. It appeared, according to the Debtor's tax returns, that the Debtor's equipment, fixtures, and furnishings, which comprised substantially all of its assets, were also

18. The LeRouxs argue, based upon Denis Peron's testimony, for example, that food purchased and prepared by the Debtor was sold by Le Bryant Park Café, Ltd. and that the same individuals operated both entities (Tr. at 24–26), that the valuation of the Debtor should have included the value of the Debtor's related corporations—Le Café Creme Madison, French Fast Food, Inc., St. Bartholomew's, and Le Bryant Park Café, Ltd.—as going concerns. *See* Defendants' Post–Trial Memorandum of Law. The argument is only partially meritorious but, even then, of no avail. St. Bartholomew's and Le Café Creme Madison were not the subject of the Purchase

Agreement and therefore are not properly includable in the consideration given by the LeRouxs. As for the other three corporations, according to the tax returns filed by French Fast Food, Inc. and Le Bryant Park Café, Ltd., substantially all of their assets consist of receivables from the Debtor, which, because of the Debtor's insolvency, are virtually worthless. Thus, the equation does not change in any material way.

19. DCL section 274.

20. DCL section 275.

pledged to the LeRouxs as collateral in the event that the Debtor defaulted in its obligations under the Purchase Agreement. Plainly, the Debtor was left with unreasonably small capital. *See In re Tuller's, Inc.,* 480 F.2d 49 (2d Cir.1973). Accordingly, the challenged transfers are avoided as fraudulent conveyances under DCL section 274.

With respect to the Debtor's claim for relief under DCL section 275, having already found that the LeRouxs engaged in actual fraud with intent to hinder or delay present and future creditors of the Debtor, and based upon ample testimony from Denis Peron and Mr. Fishman, I believe it to be plain that the Debtor, at the times of the challenged transfers, intended to incur or believed that it would incur debts beyond its ability to pay. *See Shelly v. Doe,* 173 Misc.2d 200, 660 N.Y.S.2d 937, 944 (1997), *aff'd as modified,* 249 A.D.2d 756, 671 N.Y.S.2d 803 (1998) (burden of proving that, at time of challenged conveyance, transferor believed that he would not be able to pay his debts is on claimant seeking to void conveyance as fraudulent). Accordingly, the challenged transfers are avoided as fraudulent conveyances under DCL section 275.

### *iii. Amount of Recovery*

■■■ The LeRouxs are liable under DCL sections 273, 274, 275 and 276; the only remaining issue is the amount of the Debtor's recovery. For the reasons discussed above, all of the Payments made by the Debtor under the Purchase Agreement are fraudulent as to all creditors of the Debtor pursuant to DCL section 273. Based upon the testimony of Denis Peron, Mr. Fishman and the canceled checks presented by the Debtor, the amount of the Payments made under the Purchase Agreement which may be avoided as fraudulent conveyances total $141,636.90.

However, with respect to payments made by the Debtor in 1991, 1992 and 1993, based upon the same evidence presented, the Debtor has only proven that the payments made to Societe Generale to reduce the LeRouxs' obligation to the bank for monies they had borrowed to loan to the Debtor were avoidable as fraudulent conveyances. These payments total $37,-618.29. With respect to the balance of the Debtor's payments to Xavier LeRoux during these years, according to Denis Peron's testimony regarding the canceled checks, "some were for repayment of the Xavier LeRoux loan." (Tr. at 59). Such evidence is insufficient to differentiate between those payments to the LeRouxs on account of their pre-February, 1994 Loans and those payments to Mr. LeRoux as salary. It is undisputed that Mr. LeRoux rendered services to the Debtor from 1991 through 1993 as a chef and "in running" the Debtor's restaurant. Denis Peron testified that the Debtor had paid Xavier LeRoux a weekly salary ranging from approximately $1,200 to $1,800. None of the canceled checks, which were only made payable to Mr. LeRoux, indicated whether they were tendered to Mr. LeRoux as payment of his salary or repayment of the Loans. The Debtor, having failed to establish which of these payments were for Mr. LeRoux's salary and which were for repayment of the LeRouxs' Loans, may not recover them.

### *iv. Section 513(a) of New York's Business Corporation Law*

■■■ The Debtor asserts as an additional claim for relief that the Payments to the LeRouxs for their stock violated section 513 of New York's Business Corporation Law because they were made either when the Debtor was insolvent or had rendered the Debtor insolvent as a result thereof.[21] A transfer of assets made by a

---

21. Section 513(a) provides that "[n]ot withstanding any authority contained in the certificate of incorporation, the shares of a corporation may not be purchased by the corporation, or, if redeemable, convertible or exchangeable shares, may not be redeemed, converted or exchanged, in each case for or into cash, other property, in-

corporation in violation of section 513(a), *supra*, is avoidable under section 544(b) of the Bankruptcy Code. *See In re Eljay Jrs., Inc.*, 106 B.R. 775, 781–782 (Bkrtcy. S.D.N.Y.1989). A corporation may not make installment payments to purchase its own shares of stock when it is insolvent or would be rendered insolvent, even though the stock purchase agreement may have been made when the corporation had a surplus sufficient to cover the entire purchase price, and title to the stock has been transferred. *See In re Flying Mailmen Service, Inc.*, 539 F.2d 866 (2d Cir.1976). Having already found that the Debtor was insolvent when it executed the Purchase Agreement and made the Payments on account of the Stock Purchases, I conclude that the Payments to the LeRouxs on account of the Stock Purchases violated section 513 of the Business Corporation Law.

## V. Conclusions of Law.

1. Prior to execution of the Purchase Agreement, the LeRouxs, as officers, shareholders, and directors of the Debtor, were insiders of the Debtor pursuant to section 101(31) of the Bankruptcy Code.

2. Subsequent to execution of the Purchase Agreement, the LeRouxs continued as insiders of the Debtor because they exercised control over the Debtor.

3. The Debtor did not receive fair consideration for the Payments made on account of the Stock Purchases.

4. Neither the LeRouxs nor the Debtor executed the Purchase Agreement or its related documents in good faith.

5. The Debtor was insolvent under the "balance sheet" test at the times the Payments were made because the value of its assets exceeded its liabilities and it had negative earnings for the tax years ended 1991 through 1996.

6. The Debtor's claims for relief under sections 547 and 548 of the Bankruptcy Code are time-barred.

7. The LeRouxs engaged in actual fraud, with intent to hinder or delay present and future creditors of the Debtor and are liable under DCL section 276. .

8. The LeRouxs are liable under DCL sections 273 and 274 for constructively defrauding its present creditors.

9. The LeRouxs are liable under DCL section 275 for constructively defrauding its present and future creditors.

10. The Debtor's transfers to the LeRouxs in the amount of $141,636.90 pursuant to the Purchase Agreement are avoided and may be recovered for the benefit of the Debtor's estate.

11. The Debtor's transfers to Societe Generale in the amount of $37,618.29 for the benefit of the LeRouxs are avoided and their value may be recovered for the benefit of the Debtor's estate.

12. The LeRouxs' proof of claim is bifurcated into an unsecured claim in the amount of $55,836.29 and a secured claim in the amount of $5,000.

13. Both the secured and unsecured portions of the LeRouxs' proof of claim are equitably subordinated below the status of general unsecured creditors.

14. The Debtor's transfers to the LeRouxs in the amount of $40,744.81 on account of the Stock Purchases are avoided under Business Corporation Law section 513(a).

The Debtor is directed to SETTLE AN ORDER DIRECTING ENTRY OF JUDGMENT in its favor consistent with this decision.

---

debtedness or other securities of the corporation (other than shares of the corporation and rights to acquire such shares) if the corporation is then insolvent or would thereby be made insolvent. Shares may be purchased or redeemed only out of surplus." N.Y.Bus.Corp.Law § 513(a) (McKinney's 1999).