### In re SHARP INTERNATIONAL CORP. and Sharp Sales Corp., Debtors.

### Sharp International Corp., Plaintiff,

### v.

### State Street Bank and Trust Company, Defendant.

Bankruptcy No. 99–21317–608.
Adversary No. 01–1217–608.

United States Bankruptcy Court, E.D. New York.

July 30, 2002.

---

Friedman, Wang & Bleiberg, P.C., New York City, for plaintiff and Special Counsel to debtors.

Kelley Drye & Warren LLP, New York City, for defendant.

## MEMORANDUM DECISION

CARLA E. CRAIG, Bankruptcy Judge.

This matter comes before the court on the motion of State Street Bank and Trust Company ("State Street" or "defendant") to dismiss this adversary proceeding, commenced by Sharp International Corp. ("Sharp" or "debtor"), for failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6) and for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b). State Street's motion is granted for the reasons set forth herein.

### Facts

The following is a summary of the relevant allegations of the complaint.

Sharp is a New York corporation that engaged primarily in the business of importing, assembling and distributing wrist watches, clocks, pens and mechanical pencils. (Complaint dated May 30, 2001 entered as Doc. 1 ("Complaint"), ¶ 9.)[1] In 1993, Bernard, Herbert and Lawrence Spitz (collectively, the "Spitzes") purchased 100% of Sharp's common stock from its former owners. (Complaint ¶ 10.) From 1993 to October 4, 1999, the Spitzes were Sharp's sole officers, serving in the capacity of Sharp's Chief Executive Officer, President and Chief Financial Officer

1. "Doc" refers to the papers filed in this adversary proceeding, by docket number.

respectively, with responsibility over Sharp's day-to-day affairs. (Complaint ¶ 10.)

State Street was Sharp's secured lender from November 1996 through April 1999. Pursuant to the Credit Agreement and the Security Agreement, both dated December 12, 1996 ("Credit and Security Agreements"), State Street approved a demand line of credit of $20 million secured by Sharp's assets. (Complaint ¶¶ 17–18.) Despite the $20 million credit limit, Sharp's indebtedness to State Street under the Credit and Security Agreements reached $26 million in 1997. (Complaint ¶ 19.) In July 1998, Sharp raised $17.5 million through the issuance and sale of subordinated notes to a group of investors consisting of Massachusetts Mutual Life Insurance Company, Albion Alliance Mezzanine Fund, L.P., Travelers Insurance Company, and certain of their affiliates (collectively, "Noteholders" [2]). (Complaint ¶ 15.) Sharp applied a portion of the July 1998 proceeds towards the State Street debt, which was reduced to $15 million by the autumn of 1998. (Complaint ¶ 19.)

The Spitzes perpetrated a massive fraud on Sharp and its creditors during the period between 1997 and 1999. (Complaint ¶ 12.) The Spitzes reported fictitious sales and revenues and falsely inflated Sharp's accounts receivable to the extent that fraudulent or nonexistent transactions comprised three quarters of the accounts receivable balance included in Sharp's financial statements. (Complaint ¶¶ 12–13.) Sharp falsely reported that its net sales were $52.1 million in fiscal 1997 (when its actual sales were approximately $24 million), $80.2 million in fiscal 1998 (when its actual sales were approximately $21 million), and $118.1 million in fiscal 1999

(when its actual sales were approximately $19 million). (Complaint ¶ 14.) Using these inflated figures, the Spitzes caused Sharp to raise large amounts of cash from lenders and investors. (Complaint ¶ 15.) The Spitzes also diverted more than $44 million of Sharp funds to a variety of companies in 1998 and 1999—most of which were owned by or affiliated with the Spitzes—that provided no goods, services or other consideration to Sharp. (Complaint ¶ 16.) A judgment in the amount of $44,378,650.30 was entered by this Court in November 2000 against the Spitzes and three of their companies, jointly and severally, on a complaint filed by Sharp against these defendants for conversion, breach of fiduciary duty and related claims. (Complaint ¶ 16.)

State Street first began to suspect the possibility of fraud at Sharp in the summer of 1998 when it became apparent that Sharp's behavior was strikingly similar to that of PT Imports, another of State Street's borrowers, at which State Street had recently discovered fraud. (Complaint ¶¶ 20, 30.) Furthermore, State Street had a heightened sensitivity to the possibility of fraud being committed at Sharp because, like PT Imports, Sharp failed to implement an accounting system that met with State Street's approval as required by the Credit and Security Agreements (Complaint ¶¶ 28, 31); Sharp failed to use the State Street lockbox account through which Sharp's accounts receivables were required to flow (Complaint ¶ 31); Sharp, at least on paper, was growing at an alarmingly rapid pace and consuming a great deal of cash (Complaint ¶ 32); and Sharp failed to provide, *inter alia*, accounts receivable information, including quarterly and annual financial statements,

---

**2.** On May 30, 2001, the Noteholders commenced an action against State Street in New York state court alleging facts that are virtually identical to the facts alleged in the adversary complaint, but relying on different theories of recovery. (Doc. 4 Ex. B.)

shipping documents, contracts, guarantees and orders, schedules of inventory, monthly aging of receivables, borrowing base and collateral certificates, and guarantor's financial statements as required by the Credit and Security Agreements. (Complaint ¶ 18.)

State Street's increasing concerns and suspicions that the Spitzes were engaged in fraudulent conduct were shown by actions taken by State Street during the fall of 1998. In September 1998, State Street assigned James Benninger from State Street's loan workout department, as well as Charles Glerum, an outside counsel specializing in troubled loans, to assist with the Sharp loan, although Sharp was current and was within the line limit. (Complaint ¶¶ 33–35.) Nancy Loucks, the senior vice-president for State Street with supervisory responsibility over the Sharp loan, admitted that she devoted more time to the Sharp credit than to any other credit on which she worked throughout the summer and fall of 1998, even though Sharp was not in monetary default. (Complaint ¶¶ 22, 37.) State Street also contacted several of Sharp's largest customers, which included Walmart and J.C. Penney, to determine that these customers, in fact, did purchase products from Sharp. (Complaint ¶ 38.)

Finally, in October 1998, Glerum retained First Security Services Corp., a company that specializes in investigating financial fraud, to conduct a formal investigation relating to Sharp. (Complaint ¶ 41.) Sharp alleges upon information and belief that the focus of the investigation was whether fraud was being committed at Sharp and whether State Street had claims against Sharp as a result. (Complaint ¶ 41.) Following State Street's review of the report from First Security on November 3, 1998, State Street indicated to the Spitzes that it intended to conduct formal

confirmations of Sharp's receivables with the assistance of KPMG. (Complaint ¶¶ 42–43.) Not only did the Spitzes refuse to consent to the audit by KPMG, the Spitzes also refused to make financial information, such as detailed accounts receivable statements and cash receipts details, available for the team of State Street field auditors on a scheduled visit. (Complaint ¶¶ 43, 46.) James Benninger, the State Street loan workout specialist assisting Loucks, requested checks be pulled on Sharp's accounts for the purpose of identifying the parties with whom Sharp was doing business and determining whether Sharp had made substantial payments to the Spitzes. (Complaint ¶ 45.)

On November 18, 1998, Loucks ordered Dun & Bradstreet ("D & B") reports on 18 of Sharp's reported customers, which contained sufficient disclosures to afford Loucks the knowledge that Sharp had fraudulently created fictitious customers and accounts receivables. (Complaint ¶ 47.) For example, the D & B reports revealed to Loucks and other high-level officers at State Street, including Messrs. Andrews, Lindsey, McGraime, Benninger, Lobdell, Doody and Glerum, that one supposed Sharp customer had no known address, another had gone out of business in 1991, and a number of others—to which Sharp reported selling millions of dollars worth of watches—were engaged in businesses having nothing to do with the sale of watches. (Complaint ¶ 47.) State Street halted its investigation of Sharp, and demanded and obtained Sharp's agreement to secure new financing from investors unaware of the fraud, and to use that financing to pay off the State Street debt. (Complaint ¶¶ 48, 50, 55.) State Street agreed to give Sharp until March 31, 1999 to obtain this new financing and to retire the State Street debt. (Complaint ¶ 50.)

In March 1999, the Noteholders purchased an additional $25 million in subordinated notes from Sharp. (Complaint ¶ 54.) In April 1999, Sharp paid State Street $12,250,024 from a portion of the March 1999 proceeds, reducing Sharp's indebtedness to State Street from approximately $15 million to $2.7 million. (Complaint ¶ 55.) State Street released Sharp from the $2.7 million balance in consideration for personal promissory notes from the Spitzes. (Complaint ¶ 55.)

On September 7, 1999, the Noteholders filed an involuntary petition under Chapter 11 of the Bankruptcy Code against Sharp. (Complaint ¶ 57.) An order for relief was entered on October 4, 1999, and this court appointed FTI/Kahn Consulting, Inc. as "responsible officer" of Sharp, with full power to manage Sharp's business, financial and legal affairs during the Chapter 11 case, removing the Spitzes from the operation of the business. (Complaint ¶¶ 5, 57.) Under Kahn's management, Sharp continued to operate its business and manage its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code until October 2, 2001, on which date a Chapter 11 trustee was appointed.

The judgment in the sum of $44,378,650.30 entered by this court on November 2000 against the Spitzes remains wholly unsatisfied. (Complaint ¶ 16.) On May 30, 2001, Sharp commenced this adversary proceeding against State Street.

### Standard for Motion to Dismiss

State Street's motion to dismiss is governed by Fed.R.Civ.P. 12(b)(6), made applicable in bankruptcy proceedings by Fed. R.Bankr.P. 7012. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). When determining the sufficiency of the plaintiffs claim, the court "must accept as true all of the factual allegations set out in plaintiffs complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001), *citing Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000).

The court's consideration is limited to the assertions made within the four corners of the complaint, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit. *Gregory,* 243 F.3d at 691; *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). "In short, the function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Amalgamated Bank of New York v. Marsh,* 823 F.Supp. 209, 215 (S.D.N.Y.1993) (citations omitted).

### Discussion

State Street's motion to dismiss raises the following issues:

(1) whether the complaint adequately pleads a claim against State Street for aiding and abetting the Spitzes' breach of fiduciary duties to Sharp and its creditors under Fed.R.Civ.P. 9(b) and 12(b)(6) (Count I);

(2) whether the complaint states a claim that Sharp's payment of $12,250,024 to State Street in April 1999 constituted a constructive or intentional fraudulent conveyance (Counts II through V);

(3) whether Sharp's claims against State Street are barred by the doctrine of *in pari delicto;* and

(4) whether, in the event State Street is required to return the payment received from Sharp as a fraudulent conveyance, the complaint states a claim for equitable subordination of State Street's claim against Sharp (Count VI).

### *Aiding and Abetting a Breach of Fiduciary Duty*

▮ To state a claim for aiding and abetting a breach of fiduciary duty under New York law, the claimant must plead: (1) a breach by a fiduciary of obligations to another; (2) that the defendant knowingly induced or participated in the breach; and (3) that the plaintiff suffered damages as a result of the breach. *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847–48 (2d Cir. 1987); *Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1115 (2d Cir.1986); *Kolbeck v. LIT America, Inc.,* 939 F.Supp. 240, 245 (S.D.N.Y.1996). This claim is based upon New York courts' longstanding acceptance of the principle that one who knowingly participates with a fiduciary in a breach of trust is liable to the beneficiary for any damage caused thereby. *Whitney,* 782 F.2d at 1115 (citing *Wechsler v. Bowman,* 285 N.Y. 284, 291, 34 N.E.2d 322 (1941)); *S & K Sales,* 816 F.2d at 848.

### *Breach of Fiduciary Duty*

At all relevant times, the Spitzes, as Sharp's sole officers, owed fiduciary duties to Sharp. (Complaint ¶ 60.) Each of the Spitzes breached his fiduciary duties to Sharp and its creditors by causing Sharp to raise many millions of dollars through misrepresentations and by fraudulently diverting more than $44 million of Sharp funds to companies that provided no goods, services or other consideration to Sharp. (Complaint ¶ 61.) Since neither Sharp nor State Street disputes that the Spitzes breached their fiduciary obligations to Sharp, this Court finds that Sharp has sufficiently alleged the first prong of a claim for aiding and abetting a breach of fiduciary duty.

### *Knowledge and Substantial Assistance*

With respect to the second prong of an aiding and abetting claim, knowledge and substantial assistance, State Street argues that the complaint does not adequately allege that State Street had actual knowledge of the Spitz brothers' breach of fiduciary duty, or that State Street induced or participated in the breach. To analyze the sufficiency of Sharp's pleading, it is necessary to identify precisely the breach of fiduciary duty for which Sharp seeks to hold State Street liable. For the purpose of this analysis, the Spitzes' wrongful conduct must be separated into two conceptually distinct categories: (1) causing Sharp to raise millions of dollars from the Noteholders through fraudulent misrepresentations, and (2) unlawfully diverting more than $44 million in Sharp funds to companies that provided no consideration to Sharp. Although these two types of wrongful conduct may have been combined by the Spitzes to form an overall fraudulent scheme, the wrongs are logically separable and give rise to two distinct causes of action and to different types of damages. It is necessary to analyze these alleged wrongs separately to determine whether Sharp has adequately pleaded that State Street aided and abetted a breach of fiduciary duty by the Spitz brothers. *See National Western Life Ins. Co. v. Merrill Lynch,* 175 F.Supp.2d 489, 491–92 (S.D.N.Y.2000) (court divided its analysis of an issue arising out of a fraud claim into two components "corresponding to the two distinct theories and particular instances

of actionable conduct alleged in the Complaint").

Here, the wrong for which Sharp seeks to hold State Street liable is the Spitzes' unlawful diversion of monies from Sharp. This is made clear by the fact that the damages which Sharp seeks to recover on its aiding and abetting claim are the monies that were looted by the Spitzes after State Street allegedly discovered the Spitzes' fraud. (Complaint ¶ 58; "wherefore" clause, subparagraph a.) In scrutinizing the allegations of knowledge and substantial assistance, therefore, it is necessary to consider whether the complaint adequately pleads that State Street had knowledge of, and induced or participated in, the Spitzes' looting of Sharp.

*Actual Knowledge*

In the Second Circuit, the plaintiff is not required to prove that the alleged aider and abetter had an intent to harm, but is required to prove that the alleged aider and abetter had actual knowledge of the breach of duty and induced or participated in it. *S & K Sales,* 816 F.2d at 848; *Ryan v. Hunton & Williams,* No. 99–CV–5938(JG), 2000 WL 1375265 at *1, *8 (E.D.N.Y. September 20, 2000); *Hirsch v. Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.),* 227 B.R. 606, 611 (Bankr.S.D.N.Y. 1998). Constructive knowledge is legally insufficient to impose aiding and abetting liability. *Kolbeck,* 939 F.Supp. at 246; *Williams v. Bank Leumi Trust Co. of New York,* No. 96 CIV. 6695(LMM), 1997 WL 289865 at *1, *5 (S.D.N.Y. May 30, 1997).

In addition, to the extent that the underlying primary violations are based on fraud, the allegations of aiding and abetting liability must also meet the particularity requirements of Fed.R.Civ.P. 9(b). *Kolbeck,* 939 F.Supp. at 245; *Williams,* 1997 WL 289865 at *5; *Renner v. Chase Manhattan Bank,* No. 98 CIV. 926(CSH), 2000 WL 781081 *1, *5 (S.D.N.Y.2000). Under Rule 9(b), however, while the "actual ... fraud alleged must be stated with particularity ... the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity." *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000) (citing *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996)). Rule 9(b) allows "conditions of mind" to be averred generally because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Wight,* 219 F.3d at 91–92 (*citing Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir. 1987)); *Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 494 (S.D.N.Y.2001).

Sharp alleges that State Street had a "heightened sensitivity" to the possibility of fraud at Sharp based on State Street's experience with fraud at PT Imports. (Complaint ¶ 28.) Not only was the behavior observed by State Street at Sharp similar to the behavior that State Street had observed at PT Imports, but both loans were supervised by the same person, Nancy Loucks, a senior vice-president at State Street. (Complaint ¶¶ 22, 29.) To the extent, however, that Sharp seeks to impute knowledge to State Street by analogizing events at Sharp to the PT Imports fraud, and by focusing on the circumstances that would cause State Street to suspect fraud at Sharp, this pleading at best alleges constructive knowledge, which is insufficient to impose aiding and abetting liability under New York law. *See Kolbeck,* 939 F.Supp. at 246; *Williams,* 1997 WL 289865 at *5 (allegations that the defendant "knew or recklessly disregarded," or "knew or should have known" of the primary wrongdoing insufficient to plead actual knowledge).

Sharp alleges that State Street's suspicions of fraud at Sharp became actual knowledge when Loucks reviewed D & B

reports on 18 of Sharp's customers. (Complaint ¶ 47.) The D & B reports revealed that one supposed Sharp customer had no known address, another had gone out of business in 1991, and a number of others were engaged in businesses having nothing to do with the sale of watches. (Complaint ¶ 47.) Sharp alleges that, as a result of this investigation, State Street "confirm[ed] its long-held suspicions that the Spitzes were engaged in fraudulent conduct on a major scale." (Complaint ¶ 48.)

In analyzing the sufficiency of Sharp's pleading of State Street's knowledge, it is necessary to identify the knowledge that is relevant to Sharp's aiding and abetting claim against State Street. Because the wrong for which Sharp seeks recovery against State Street is the Spitzes' looting of Sharp, the relevant inquiry is whether Sharp adequately alleges that State Street had knowledge that the Spitzes were diverting monies from Sharp.

Sharp's pleading falls short of alleging that State Street had actual knowledge of the Spitzes' diversion of monies from Sharp. Even if the facts pleaded concerning the D & B reports are accepted as providing the requisite factual support for the otherwise conclusory allegation that State Street "confirm[ed] its long-held suspicions that the Spitzes were engaged in fraudulent conduct on a major scale," these facts at most support an inference that State Street had actual knowledge that the Spitzes were fraudulently inflating Sharp's receivables. The fact that a company is inflating its receivables does not necessarily mean that the company's principals are looting it.[3] Al-

though it is possible that State Street suspected that the Spitzes were engaged in this activity in order to cover up the fact that they were siphoning monies from Sharp, suspicion and surmise do not constitute actual knowledge. *Ryan*, 2000 WL 1375265 at * 9 (allegations that the bank suspected fraudulent activity did not raise an inference of actual knowledge). For this reason, the complaint fails to adequately allege that State Street had actual knowledge of the primary wrongdoing.

Sharp argues that a different result is compelled by the Second Circuit's holding in *Wight v. Bankamerica Corp.*, 219 F.3d 79 (2d Cir.2000). There, the court found that plaintiffs, liquidators of the Bank of Credit and Commerce International ("BCCI"), which was "involved in countless fraudulent schemes, all designed to conceal its underlying insolvency," had stated a claim against Security Pacific International Bank ("SPIB") for aiding and abetting one of those fraudulent schemes. *Id.* at 81, 92. Reversing the district court, which found that the complaint failed under Fed. R.Civ.P. 9(b) to plead the defendant's knowledge of the fraud with sufficient particularity, the Court of Appeals found that plaintiffs pleaded facts which showed that SPIB "had both a clear opportunity and a strong financial motive to aid the ... fraud." *Id.* at 92. This pleading, together with deposition testimony by an SPIB officer that (1) he knew the companies SPIB was dealing with were shell companies; (2) he suspected that there was no business purpose to the transfers that SPIB was effectuating for BCCI; and (3) he knew that BCCI might be using SPIB to launder

---

**3.** For example, in *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 451 (7th Cir.1982), the court described a fraudulent scheme in which a corporation's corrupt managers (who were also shareholders) inflated the company's apparent net worth and thus the market value of its stock. The court noted that "those involved in the fraud were not stealing from the company, as in the usual corporate fraud case, but were instead aggrandizing the company (and themselves) at the expense of outsiders."

money, was found to satisfy the requirements of Rule 9(b). *Id.* In *Wight,* the defendant's "strong financial motive" to aid the fraud was found in the fact that "BCCI paid richer fees than SPIB received from other clients." *Id.*

This Court does not agree that Sharp's pleading of State Street's knowledge of the Spitzes' fraud is adequate under the standard set forth in *Wight.* Here, there is no allegation that State Street received any extraordinary compensation from Sharp (such as "richer fees" than those paid by other clients) which would provide it with a "strong financial motive" to aid the fraud. Courts have consistently found that allegations of ordinary economic motives are insufficient to plead a strong financial motive to aid the fraud, and are not a substitute for pleading actual knowledge of the primary wrongdoing. *See Cromer,* 137 F.Supp.2d at 494–495 ("Ordinary economic motive, however, is insufficient to support the [pleading of a clear opportunity and motive to aid the fraud]"); *THC Holdings Corporation v. Chinn,* 95 Civ. 4422(KMW), 1998 WL 50202, *9, 1998 U.S.Dist. LEXIS 1276 *1, *26–27 (S.D.N.Y. Feb. 6, 1998) ("A mere allegation that defendant was in a position to receive normal compensation for professional services rendered is not sufficient to support a showing of motive in the fraud scienter analysis").

Moreover, there is no allegation from which it may be inferred that State Street had a "strong financial motive" (or indeed any motive whatsoever) to aid the fraud which it is charged with aiding and abetting—*i.e.,* the Spitzes' diversion of funds from Sharp. Even if State Street's desire to receive repayment of its loan were found to constitute a "strong financial motive" to aid the Spitzes in fraudulently inducing the Noteholders to invest in Sharp, thereby providing funds to repay

State Street, such allegations cannot make up for the failure to plead facts from which it may be inferred that State Street had knowledge of the fraud for which Sharp seeks to hold it liable—*i.e.,* the Spitzes' looting.

*Substantial Assistance*

■ A defendant may be held liable for "participating" in another's breach of fiduciary duty only if the defendant provided "substantial assistance" to the primary violator. *S & K Sales,* 816 F.2d at 849; *Kolbeck,* 939 F.Supp. at 247. Under New York law, substantial assistance may be found where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *Kolbeck,* 939 F.Supp. at 247; *Ryan,* 2000 WL 1375265 at * 9; *Cromer,* 137 F.Supp.2d at 470. However, the inaction of an alleged aider and abetter constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff. *Kolbeck,* 939 F.Supp. at 247; *Ryan,* 2000 WL 1375265 at * 10; *Cromer,* 137 F.Supp.2d at 470. The relationship between a bank and its customer is not a fiduciary one, but only that of a debtor and creditor. *Ryan,* 2000 WL 1375265 at * 10; *Williams,* 1997 WL 289865 at *5 n. 3.

With respect to pleading inducement or substantial assistance, the complaint falls short, for the same reason that it falls short in pleading actual knowledge. Sharp alleges that State Street affirmatively induced the Spitzes to expand the fraud by obtaining "new financing from investors unaware of the fraud" (Complaint ¶ 50), and substantially assisted the fraud when one of its officers deliberately dodged phone calls from the proposed new investors, and when State Street gave its consent to Sharp's sale of $25 million in subordinated notes to those investors. (Complaint ¶¶ 52–53.) It is difficult to see

how failure to return or refusing to take phone calls, even if characterized as "dodging" calls, could constitute more than inaction. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 207 (2d Cir.1989) ("inaction can create aider and abettor liability only where there is a conscious or reckless violation of an independent duty to act"). Furthermore, Sharp's pleading that State Street induced the fraud on the Noteholders by demanding that Sharp obtain "new financing from investors unaware of the fraud" (Complaint ¶ 50) falls short under Fed.R.Civ.P. 9(b), by failing to allege who made the demand, who else was present, exactly what was said, and where this occurred. *Cromer*, 137 F.Supp.2d at 468; *Ryan*, 2000 WL 1375265 at *7. A more fundamental problem with Sharp's pleading, however, is that these allegations, even if accepted as adequate to plead that State Street assisted the Spitzes in defrauding the Noteholders, does not support a claim that State Street induced, participated in, or substantially assisted the Spitzes in diverting monies from Sharp.

### Constructive Fraudulent Conveyance Claims—DCL §§ 273, 274, 275

 Counts II through IV of the complaint allege that Sharp's repayment of $12,250,024 to State Street in April 1999 (the "Payment") constituted a constructive fraudulent conveyance, because at the time

that the Payment was made, State Street was aware of the Spitzes' breaches of their fiduciary duties to Sharp and of Sharp's resulting insolvency. Therefore, according to Sharp, State Street did not receive the Payment in good faith and did not provide fair consideration for the Payment within the meaning of N.Y.Debt. & Cred.Law ("DCL") § 272. Sharp further alleges that the Payment is a constructive fraudulent conveyance because at the time it was made: (1) Sharp was insolvent (Complaint §§ 71–72, *citing* DCL § 273)[4]; (2) Sharp was engaged, or was about to engage, in a business or transaction for which the property remaining in its possession constituted unreasonably small capital (Complaint ¶¶ 76–77, *citing* DCL § 274)[5]; and (3) Sharp intended to incur, or believed that it would incur, debts beyond its ability to pay as they matured (Complaint ¶¶ 81–82, *citing* DCL § 275).[6]

 A constructive fraudulent conveyance is a transfer made without fair consideration, regardless of the intent of the transferor. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir.1995); *Atlanta Shipping Corp., Inc. v. Chemical Bank*, 818 F.2d 240, 248 (2d Cir.1987) ("An essential element of a claim pursuant to DCL §§ [273–275] is lack of fair consideration"). Even if this court credits on this

4. DCL § 273 provides:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

5. DCL § 274 provides:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

6. DCL § 275 provides:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

motion (as it must) Sharp's allegations that the Payment was made while Sharp was insolvent; that Sharp was engaged, or was about to engage, in a transaction for which the property remaining in its possession constituted unreasonably small capital; and that Sharp believed that it would incur debts beyond its ability to pay as they matured, the Payment does not constitute a constructive fraudulent conveyance if it was made for fair consideration. *HBE Leasing*, 48 F.3d at 633.

"Fair consideration" is defined under DCL § 272 as follows:

Fair consideration is given for property, or obligation, .

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

■ The Second Circuit has analyzed the elements of "fair consideration" under DCL § 272 as follows: (1) the recipient of the debtor's property "must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; *and* (2) such exchange must be a 'fair equivalent' of the property received; *and* (3) such exchange must be 'in good faith'." *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058–59 (2d Cir.1995) (emphasis in original). Therefore, a conveyance is not made with fair consideration unless the exchange is a fair equivalent and is made in good faith. *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 430 (Bankr.S.D.N.Y. 1998) ("[A] transfer made by an insolvent debtor to an affiliate or insider in satisfac-

tion of an antecedent debt lacks good faith and is constructively fraudulent" (collecting cases)); *Lawson v. Barden (In re Skalski)*, 257 B.R. 707, 711 (Bankr. W.D.N.Y.2001) (finding that a gift was a fraudulent conveyance because there was insufficient value given in exchange); *A.F.L. Falck v. E.A. Karay Co., Inc.*, 722 F.Supp. 12, 17 (S.D.N.Y.1989) (finding that a conveyance made by a corporation in satisfaction of an antecedent debt owed its officer and controlling shareholder was fraudulent).

■ The weight of authority holds that a claim for constructive fraudulent conveyance is not required to be pleaded with particularity under Fed.R.Civ.P. 9(b). *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr.S.D.N.Y.1999) ("The pleading of constructive fraud, as opposed to actual fraud, must only comply with Fed.R.Civ.P. 8(a) because scienter is not an element"). This is because "[a]lthough tagged with the title 'fraudulent,' fraud has nothing to do with the constructive fraudulent transfer claim. The transaction is based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee." *White Metal Rolling*, 222 B.R. at 428–429.

In November 1996, State Street approved a $20 million demand line of credit to Sharp and the terms of the loan agreement were later formalized into a Credit Agreement and a Security Agreement, both dated December 12, 1996. (Complaint ¶¶ 17–18.) In April 1999, the outstanding amount owed to State Street under these agreements was approximately $15 million. (Complaint ¶¶ 19, 55.) Thus, State Street's acceptance of the Payment discharged an antecedent debt.

The second element of "fair consideration" under DCL § 272 has also been met. The alleged fraudulent transfer was

for fair equivalent value, because Sharp received an "amount not disproportionately small as compared with the value of the property, or obligation obtained." DCL § 272. Sharp's debt owed to State Street was reduced by the amount of the Payment. In exchange for the Payment, Sharp also obtained a full release from State Street the remaining $2.7 million, as well as a full release of any other claims arising out of the State Street/Sharp lending relationship. (Complaint ¶ 55.)

While conceding the foregoing, Sharp alleges that State Street did not receive the Payment in good faith because State Street knew of the Spitzes' fraud and received the Payment as a *quid pro quo* for its assistance of the fraud. Sharp argues that these allegations of bad faith, together with the allegations that Sharp was insolvent at the relevant time, satisfy the requirements for pleading a constructive fraudulent conveyance claim.

The Second Circuit provided a detailed analysis of the meaning of "fair consideration" under DCL § 272 in *HBE Leasing Corporation v. Frank*, 48 F.3d 623 (2d Cir.1995). There, judgment creditors sought to set aside a mortgage given by the judgment debtor to an insider (the mother of the debtor's principal). *Id.* at 629. It was not disputed that the mother advanced monies to the judgment debtor equal to the amount of the mortgage given; however, shortly after the funds were received, they were disbursed to the debtor's principal, her son, purportedly in repayment of loans he had earlier made to the judgment debtor. *Id.* at 630.

Considering whether the mortgage given to the mother could be avoided as a constructive fraudulent conveyance, the court noted that "New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers or directors are deemed not to be transfers for fair consideration." *HBE Leasing Corp.*, 48 F.3d at 634 (citing, *inter alia, Farm Stores, Inc. v. School Feeding Corp.*, 102 A.D.2d 249, 477 N.Y.S.2d 374, 378 (2d Dep't 1984), *aff'd*, 64 N.Y.2d 1065, 489 N.Y.S.2d 877, 479 N.E.2d 222 (1985)). The court found, however, that the *Farm Stores* exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances could not be applied to invalidate the mother's mortgages, even though she was an insider, because the mortgages secured a contemporaneous advance of funds. *Id.* at 635.

The court then considered whether the two transactions (in which the mother made a loan to the judgment debtor and received a mortgage, and the payment shortly thereafter to the son) could be collapsed and treated as phases of a single transaction under the New York Uniform Fraudulent Conveyances Act. In performing this analysis, the court applied law that has evolved in the context of leveraged buyouts.[7] *Id.* at 635. Where the consideration given to the debtor by the first transferee is re-conveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors, the court held, the transaction may be collapsed, but only

---

**7.** See *United States v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556 (M.D.Pa.1983) (Pennsylvania UFCA), *aff'd sub nom.; United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 998 (S.D.N.Y.1991) (New York UFCA); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 500–04 (N.D.Ill.1988) (Illinois UFCA); *In re Best Products Co.*, 168 B.R. 35, 56–57 (Bankr.S.D.N.Y.1994) (New York UFCA).

if the first transferee has "actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent." *Id.* Apply this legal framework to the facts of the case, the court found that the judgment debtor's payment to its principal of the funds advanced by the mother was a fraudulent conveyance under *Farm Stores,* so that "the net result was that [the mother] received a mortgage from [the judgment debtor], while [the son] received money from [the mother]. Thus, at the end of the day [the judgment debtor] received nothing in exchange for the first mortgage." *Id.* at 637. The court further found that the mother had constructive knowledge "of schemes in which her cash advances were expended by [the judgment debtor] for improper purposes." The court therefore avoided the mortgage given to the mother as a fraudulent conveyance.

Finally, the court considered whether, as the court below had held, lack of good faith on the part of the transferee was grounds for avoiding the mortgage "independent of the role that mental state plays in the analysis whereby the transactions are collapsed." *HBE Leasing Corp.,* 48 F.3d at 636. Reversing the district court, the Second Circuit held that

> [T]his use of bad faith as an independent ground cannot be sustained. Though some New York cases have broadly construed the reference to "good faith" in DCL § 272's definition of "fair consideration," *see, e.g.,* [*Southern Ind., Inc. v. Jeremias,* 66 A.D.2d 178, 411 N.Y.S.2d 945, 949 (2d Dep't 1978)] (voiding preferences to corporate insiders), other authorities have cautioned against an expansive reading of the UFCA's reference to good faith, *see, e.g.,* [*Boston Trading Group, Inc. v. Burnazos,* 835 F.2d 1504, 1512–13 (1st Cir.1987)]. We believe that where, as here, a transferee has given equivalent value in exchange for the debtor's property, *the statutory requirement of "good faith" is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme.*

*HBE Leasing Corp.,* 48 F.3d at 636 (emphasis added).

Sharp relies upon the language from *HBE Leasing* underlined above as support for its argument that it has adequately pleaded a lack of fair consideration by alleging that, at the time it received the Payment, State Street lacked good faith because it had actual knowledge of the Spitzes' fraud against the Noteholders. (Doc. 6 at 15–17.) The court in *HBE Leasing* was very clear, however, that lack of good faith, "independent of the role that mental state plays in the analysis whereby the transactions are collapsed," cannot constitute a basis for avoiding a transfer as a fraudulent conveyance. In the context of that case, therefore, the underlined language must be understood to refer to actual or constructive knowledge of a fraudulent scheme that has the effect of depriving the debtor of the benefit of the consideration given in exchange for the transfer that is sought to be avoided—for example, knowledge that would provide a basis for collapsing two or more transactions under the analysis set forth in *HBE Leasing.*

No such scenario is alleged in this case. The consideration given by State Street for the Payment was the funds advanced to the debtor by State Street under its 1996 Credit and Security Agreements with Sharp. There is no allegation that those funds were misused by Sharp. (Complaint ¶¶ 17–19.) Certainly there is no allegation that State Street had actual or constructive knowledge, at the time it made advances to Sharp, that those funds would be used for an improper purpose. The analy-

sis that led to a finding of fraudulent conveyance in *HBE Leasing* simply has no application in this case.

The conclusion that the facts alleged by Sharp do not state a claim of constructive fraudulent conveyance is also supported by the court's comment in *HBE Leasing* that "New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers or directors are deemed not to be transfers for fair consideration." *HBE Leasing Corp.*, 48 F.3d at 634. Indeed, consistent with this observation, the parties have not cited, nor has this Court been able to locate, any case applying New York law that finds a payment of a valid antecedent debt to a non-insider to be a fraudulent conveyance.

Also consistent with this conclusion is the authority holding that Rule 9(b) need not be complied with in pleading a claim of constructive fraudulent conveyance, because the claim "is based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee." *White Metal Rolling*, 222 B.R. at 429.

Nothing in *Atlanta Shipping Corp., Inc. v. Chemical Bank*, 818 F.2d 240 (2d Cir. 1987) leads to any different result. There, the plaintiff contended that the defendant bank's "special knowledge of [the debtor's] financial obligations to other creditors" when it initially made its loans to the debtor established a lack of good faith. The Second Circuit rejected this argument because it found that the loan did not adversely affect the debtor's balance sheet or encumber its ability to meet its other

obligations. *Id.* at 249. Thus, the court engaged in the analysis described in *HBE Leasing*, and found that (like in this case), it had no application. Certainly the case does not stand for the proposition that lack of good faith, independent of such an analysis, can serve as a basis for a finding of constructive fraudulent conveyance.

For the foregoing reasons, Counts II through IV of the complaint, seeking recovery of the Payment from State Street as a constructive fraudulent conveyance, are dismissed.

### *Intentional Fraudulent Conveyance Claims—DCL §§ 276, 276–a*

The complaint also alleges that Sharp made the Payment with actual intent to hinder, delay, or defraud its other creditors by perpetuating the other creditors' ignorance of the Spitzes' breaches of their fiduciary duties to Sharp. (Complaint ¶ 84.) Unlike a claim of constructive fraudulent conveyance under DCL §§ 273–275, which is based upon lack of fair consideration, DCL § 276 focuses on the actual intent of the transferor. *United States v. McCombs*, 30 F.3d 310, 327 (2d Cir. 1994). If there was an actual intent to hinder, delay or defraud creditors, the conveyance may be set aside under DCL § 276 regardless of the adequacy of the consideration given or the solvency of the transferor.[8] *McCombs*, 30 F.3d at 328; *Le Café Creme, Ltd. v. Roux (In re Le Café Creme, Ltd.)*, 244 B.R. 221, 239 (Bankr. S.D.N.Y.2000). The party asserting a claim for fraudulent conveyance has the burden of proving actual intent to defraud by clear and convincing evidence. *McCombs*, 30 F.3d at 328 (*citing ACLI Gov't Sec. v. Rhoades*, 653 F.Supp. 1388,

---

**8.** DCL § 276 provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to

hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

1394 (S.D.N.Y.1987)). It is the intent of the transferor and not the intent of the transferee that is dispositive under DCL § 276. *Le Café Creme*, 244 B.R. at 239; *Crowthers*, 129 B.R. at 999 (*citing Brody v. Pecoraro*, 250 N.Y. 56, 61–62, 164 N.E. 741 (1928)). Actual intent to defraud must be pleaded in compliance with the requirements of Fed.R.Civ.P. 9(b). *Atlanta Shipping*, 818 F.2d at 251.

▆▆▆ The Second Circuit has found certain "badges of fraud" to be circumstantial evidence of actual intent, because actual intent is rarely shown by direct evidence. Badges of fraud include:

1. lack or inadequacy of consideration;
2. family, friendship or close associate relationship between the parties;
3. retention of possession, benefit or use of the property in question by the debtor;
4. the financial condition of the party sought to be charged both before and after the transaction in question;
5. the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
6. the general chronology of the events and transactions under inquiry.

*Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir.1983); *Le Café Creme*, 244 B.R. at 239.

None of the badges of fraud are alleged in this case. Sharp argues that this is irrelevant because the complaint has sufficiently alleged facts that are direct evidence of actual fraudulent intent. (Doc. 6 at 18–19.) According to Sharp, this includes allegations that the Spitzes grossly inflated Sharp's reported sales and revenues; that the Spitzes gave fraudulent financial statements; and that the Spitzes purchased State Street's silence with the payment of $12,250,024.

In order to state a claim for intentional fraudulent conveyance, Sharp must allege with the particularity required by Fed. R.Civ.P. 9(b) facts which give rise to an inference that Sharp made the Payment to State Street with actual intent to hinder, delay or defraud other creditors. However, Sharp's Payment to State Street did not adversely affect Sharp's financial condition or its ability to repay its other creditors, since it merely substituted Sharp's obligation to the Noteholders for its obligation to State Street (and indeed resulted in the forgiveness by State Street of $2.7 million more than the amount of the Payment). Thus, Sharp's Payment did not have the effect of hindering, delaying or defrauding Sharp's other creditors.

With respect to Sharp's allegation that the Payment was made with actual fraudulent intent because it was made to purchase State Street's silence as to the Spitzes' fraudulent schemes, this allegation is not supported with the type of factual specificity required by Rule 9(b). There is no allegation, for example, that any particular conversation took place in which State Street threatened to go public with its evidence of fraud, and agreed not to do so in exchange for the Payment. There is no allegation that State Street had any duty to reveal its suspicions of fraud, or that anything prevented it from doing so after it received the Payment.

▆▆▆ Sharp's allegations that State Street knew of the fraud perpetrated against the Noteholders are insufficient to state a claim that Sharp's subsequent payment to State Street was an intentional fraudulent conveyance. A transferee's acceptance of a payment, even with knowledge that the funds were obtained by

fraudulent means, does not give rise to a claim of fraudulent conveyance if the transferee did not participate in the fraud. This question was extensively analyzed in *Boston Trading Group, Inc. v. Burnazos,* 835 F.2d 1504 (1st Cir.1987) (cited with approval in *HBE Leasing,* 48 F.3d at 634, 636):

> Suppose that S & K [in this case, Sharp] ... obtain C's [in this case, the Noteholders'] money through dishonest means (larceny, fraud, etc.) and use it to pay a debt that S & K owe B [in this case State Street], a transferee who knows of, *but did not participate in,* S & K's dishonesty. Does § 7 of the Massachusetts Fraudulent Conveyance Act [counterpart to DCL § 276] permit C to recover its money from B? We think the district court correctly ruled that § 7 does not.

> [W]e have found no modern case (nor any reference in any modern case, treatise, or article to any case in the past 400 years) that has found a fraudulent conveyance in such circumstances. That is not surprising, for the fraud or dishonesty in this example concerns not S & K's transfer to B, but *the manner in which the original debt to C arose.* Fraudulent conveyance law is basically concerned with *transfers* that "hinder, delay or defraud" creditors; it is not ordinarily concerned with how such debts were created.

> \* \* \* \* \* \*

> [T]o find an actual intent to defraud creditors when, as in our example, an insolvent debtor prefers a less worthy creditor, would tend to deflect fraudulent conveyance law from one of its basic functions (to see that an insolvent debtor's limited funds are used to pay *some* worthy creditor), while providing it with

a new function (determining *which* creditor is the more worthy).

*Id.* at 1510–1511 (emphasis in original).

The *Boston Trading* court noted that, although the scenario described in its example "may seem to cry out for relief as a matter of simple justice ... the legal principles that most readily provide the necessary relief are not involved in this case." *Id.* at 1507. Thus, the court concluded that the fact pattern described does not give rise to a claim for actual or constructive fraudulent conveyance, although the fraud victim might be able to obtain recovery from the recipient of its funds under principles of restitution, constructive trust, or the like. *Id.*

Although Sharp may have defrauded the Noteholders, it is difficult to see how the Payment could be said to have facilitated or furthered that fraud, which was completed before the Payment was made. Although State Street may have had actual or constructive knowledge that Sharp defrauded the Noteholders, this Court does not believe that Sharp has alleged any act by State Street that constitutes participation in the fraud.

 The closest Sharp comes to pleading participation by State Street in a fraud against the Noteholders is the allegation that State Street consented to the transaction, and that under the State Street loan documents such consent was necessary in order for Sharp to close the transaction with the Noteholders. However, providing consent to another transaction by the borrower under a loan agreement, even with actual or constructive knowledge that the borrower is engaging in fraud, does not constitute participation in the fraud so as to transform the subsequent repayment of the loan into an intentional fraudulent conveyance. Where a loan agreement prohibits a borrower from incurring other indebtedness without the lender's consent, this provision is for the

benefit of the lender, and the lender's decision whether or not to consent is governed by the lender's assessment of its own best interests. If the loan agreement so provides, the lender may not unreasonably withhold its consent to a borrower's request for permission to incur other indebtedness; however, under New York law, in the absence of such a provision, the lender may give or withhold its consent in its sole discretion. *Teachers Ins. and Annuity Ass'n of America v. Wometco Enter., Inc.,* 833 F.Supp. 344, 349 (S.D.N.Y.1993) ("in the absence of explicit contractual language stating that a party may not unreasonably withhold consent, parties may withhold consent for any reason or no reason, and no implied obligation to act in good faith exists to limit that choice"). Certainly there is no authority requiring a lender to consider the interests of third parties (such as, in this case, the Noteholders) in exercising its right to give or withhold consent under a loan agreement. Such a rule would effectively make the Noteholders third-party beneficiaries of the Loan Agreement between Sharp and State Street. There is no basis under New York law for such a result.

Since Sharp has failed to plead with particularity either direct evidence of actual intent to defraud or the presence any "badges of fraud," the claim under DCL § 276 should be dismissed.

### In Pari Delicto and Equitable Subordination

This Court does not reach the issue of whether the doctrine of *in pari delicto* is applicable to the claim for aiding and abetting a breach of fiduciary duty, because the complaint failed to sufficiently allege this claim. As for the claims for fraudulent conveyance, although the trustee clearly has standing to pursue such claims pursuant to 11 U.S.C. § 544, DCL §§ 273–275 and 28 U.S.C. § 157(b)(2)(H), those claims are dismissed for the reasons set forth above. It is likewise unnecessary to reach the issue of whether State Street's claims against Sharp (which would arise if State Street were required to return the Payment) should be equitably subordinated to the claims of Sharp's other creditors, because Sharp's claims for recovery of the Payment are dismissed for the reasons set forth above.

### Conclusion

For the reasons stated in this opinion, this court finds that the complaint fails adequately to plead a claim against State Street for aiding and abetting the Spitzes' breach of fiduciary duties to Sharp, or for constructive or actual fraudulent conveyance. Accordingly, State Street's motion to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6) and 9(b) is granted. State Street is directed to settle an appropriate order.